Fletcher J. JOHNSON, M.D.,
et ano., Plaintiffs,

v.

NYACK HOSPITAL, et al., Defendants.

No. 94 Civ. 7464 (LAK).

United States District Court,
S.D. New York.

Feb. 11, 1997.

George R. Clark, Annemarie Scanlon Harthun, Reed Smith Shaw & McClay, Harry Frischer, Robert Frenchman, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, for Plaintiffs.

Ronald S. Rauchberg, Nancy Kilson, Francis D. Landrey, Patricia J. Clarke, Victoria A. Rosen, Proskauer Rose Goetz & Mendelsohn L.L.P., for Defendants.

## MEMORANDUM OPINION

*KAPLAN, District Judge.*

This action in its present form involves a claim by plaintiff Fletcher J. Johnson, M.D., that his 1994 application for reinstatement of vascular and thoracic surgical privileges at defendant Nyack Hospital was denied on the basis of race. This allegedly violated 42 U.S.C. § 1981 and, because it is said to have taken place pursuant to a racially motivated conspiracy, 42 U.S.C. § 1985(3) as well. Defendants move for partial summary judgment dismissing (1) the amended complaint as to certain defendants on the ground that there is no genuine issue of fact as to their participation in the 1994 decision, and (2) the conspiracy claim under 42 U.S.C. § 1985(3) as against all defendants on the ground that the defendants are incapable as a matter of law of conspiring to violate the civil rights laws in connection with the 1994 action. Dr. Johnson moves for leave to file a second amended complaint in an effort to cure any of the alleged deficiencies relied upon by defendants. As the only substantial issue regarding the amendment is the sufficiency of the proposed changes, leave to amend is granted and the Court will treat defendants' motion

as addressed to the second amended complaint.[1]

This dispute has been the subject of three reported decisions of this Court and two of the Second Circuit.[2] The Court assumes familiarity with those opinions and therefore refers to the facts only to the extent necessary to this decision.

## I

The defendants in this case, apart from Nyack Hospital, are Kenneth Steinglass, M.D., Daniel Berson, M.D., Lawrence Simon, M.D., James Dawson, Donald Winikoff, M.D., and Greger Anderson.[3] All allegedly were involved in Nyack's 1987 revocation of Dr. Johnson's vascular/thoracic surgical privileges. Defendants, however, maintain that Drs. Berson, Winikoff and Steinglass and Mr. Dawson had no involvement whatever in the 1994 denial of reinstatement. As it already has been established that plaintiff's claims with respect to the 1987 decision are time-barred, *Johnson II,* defendants maintain that the action should be dismissed as against these defendants.

## A.

Dr. Berson was Chief of the Department of Surgery at Nyack from 1982 to 1988. (Cpt[4] ¶ 13) Mr. Dawson was president of the hospital from 1978 to 1991. (*Id.* ¶ 14) Dr. Winikoff has been co-chair of the Peer Review Committee from before 1987 to date. (*Id.* ¶ 15)

Dr. Berson and Mr. Dawson allegedly requested that Dr. Steinglass review all of Dr. Johnson's vascular/thoracic surgery cases, a review which is said to have led to the 1987 revocation of privileges. (*Id.* ¶¶ 46–76) Dr. Winikoff allegedly chaired a meeting of the Peer Review Committee on February 24, 1987 at which the committee allegedly rubber stamped the Steinglass review. (*Id.* ¶ 63)

The crux of plaintiff's argument concerning these three defendants is that their 1987 actions were part of a racially motivated conspiracy directed at Dr. Johnson and that the denial of reinstatement in 1994 was a necessary part of the alleged plan to eliminate African–Americans from the vascular/thoracic surgical staff at. Nyack. (Pl. Mem. 8) As they put it, defendants "Berson, Dawson, and Winikoff's actions with respect to the 1987 revocation of Dr. Johnson's privileges was, and is, part of the conspiracy to deny Dr. Johnson—because of his race—the right to hold thoracic and vascular privileges at Nyack." (*Id.* at 13–14) There is no suggestion and no evidence, however, that any of these three defendants had anything to do with the 1994 action apart from the allegation that the 1994 decision was based in part on 1987 events. On this basis, plaintiff asserts—without citation of any authority whatsoever—that he has a timely civil rights claim against these defendants based on the 1994 action. Defendants maintain the contrary, although they too cite no authority. It is helpful, therefore, to return to first principles.

To begin with, these defendants are sued under both Sections 1981 and 1985(3). The former claim is that each of them, either as a principal or perhaps as an aider and abettor, deprived Dr. Johnson of his federally protected right to equality in making and enforcing contracts, here the contract implicit in the medical staff relationship with Nyack Hospital. The latter asserts that the defendants entered into a conspiracy to deny him that right on the ground of his race. It is important consider these claims separately for purposes of this motion.

As the only allegations against these defendants pertinent to the Section 1981 claim are of 1987 actions, the Court must deter-

---

**1.** Defendants object also to the fact that the second amended complaint contains claims which previously have been dismissed. The objection is without merit. Plaintiffs are merely preserving their rights with respect to the dismissed claims. The grant of leave to amend does not revive any claim previously dismissed.

**2.** *Johnson v. Nyack Hospital,* 86 F.3d 8 (2d Cir. 1996), *aff'g* 891 F.Supp. 155 (S.D.N.Y.1995)

("*Johnson II*"); *Johnson v. Nyack Hospital,* 964 F.2d 116 (2d Cir.1992), *aff'g* 773 F.Supp. 625 (S.D.N.Y.1991); *Johnson v. Nyack Hospital,* 169 F.R.D. 550 (S.D.N.Y.1996).

**3.** Plaintiff has dropped Rockland Thoracic Associates, P.C. from the second amended complaint.

**4.** "Cpt" refers to the second amended complaint.

mine the effect of *Johnson II*, which dismissed claims based on the 1987 events as untimely. This requires consideration of what claims Dr. Johnson had and when they accrued.

"Generally, a cause of action accrues and [the limitations period] begins to run when a defendant commits an act that injures a plaintiff[ ]. . . . [E]ach time a plaintiff is injured by an act of the defendant, a cause of action accrues to him to recover the damages caused by the act and . . ., as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–39, 91 S.Ct. 795, 805–06, 28 L.Ed.2d 77 (1990). But *Zenith* articulated another important principle as well. Each "cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial. [citations omitted] Thus, if a plaintiff feels the adverse impact of [a] . . . conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the cause of action." *Id.* at 338–39, 91 S.Ct. at 805–06. Only those future damages caused by an action prior to the start of the limitations period that would have been too speculative or unpredictable if sued upon promptly may be recovered in an action brought within the limitations period. *Id.* at 339, 91 S.Ct. at 806.[5]

Dr. Johnson's principal Section 1981 claim is that he was the victim of actions by Drs. Berson and Winikoff and Mr. Dawson which resulted in the revocation of his vascular/thoracic surgical privileges in 1987 and that those same actions influenced the 1994 refusal to reinstate those privileges. The moment those privileges were revoked, however, Dr. Johnson knew that his income stream from the performance of such surgery at Nyack Hospital had been terminated. There is no suggestion that recovery of damages to compensate for the loss of that income would have been precluded as too speculative. Assuming he had sued promptly and prevailed, he would have been entitled to compensation for any income he lost by virtue of the revocation.[6]

▌ The economic loss for which Dr. Johnson now seeks compensation is the loss of any income he would have earned had his privileges been reinstated in 1994. This of course is entirely included in the income stream Dr. Johnson could have recovered following the 1987 revocation of his privileges. These defendants, however, are not alleged to have taken any action after 1987 which brought about the 1994 decision except insofar as their alleged involvement in the 1987 privileges revocation may have affected it. As Dr. Johnson could have recovered for that injury years ago, the dismissal of Count III, the Section 1981 claim, insofar as it was based on the 1987 events, necessarily forecloses any recovery by Dr. Johnson against these defendants for his alleged economic harm resulting from their 1987 actions.

▌ Economic harm, however, is not the only sort of injury for which Dr. Johnson is entitled to seek compensation. Section 1981 plaintiffs may recover for emotional distress as well,[7] and Dr. Johnson alleges that he

---

**5.** *Zenith* was an antitrust case. There is no reason, however, why the principles referred to in the text should not be applied here. *See Hernandez Jimenez v. Calero Toledo*, 576 F.2d 402, 404 (1st Cir.1978) (applying *Zenith* in civil rights context); *Kadar v. Milbury*, 549 F.2d 230, 234 (1st Cir.1977) (same).

**6.** *See, e.g., Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975) (compensatory damages available under § 1981); *T & S Service Associates, Inc. v. Crenson*, 666 F.2d 722, 727 (1st

Cir.1981) (lost earnings recoverable); *Davis v. Supermarkets General Corp.*, 584 F.Supp. 870, 872 (E.D.Pa.1984) (future wages recoverable); *cf. United States v. Burke*, 504 U.S. 229, 241, 112 S.Ct. 1867, 1874, 119 L.Ed.2d 34 (1992) (referring to broad remedies available under antidiscrimination statutes other than Title VII).

**7.** *E.g., Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1498 (9th Cir.1995); *Thomas v. Resort Health Related Facility*, 539 F.Supp. 630, 633 (E.D.N.Y.1982); *see Hurley v. Atlantic City Police Dept.*, 933 F.Supp. 396, 423 (D.N.J.1996).

suffered emotional injury as a result of the 1994 denial. As each adverse action by Nyack Hospital reasonably might be found to have inflicted its own sting and humiliation, one cannot now exclude the possibility that a trier of fact could find that Dr. Johnson suffered emotional distress as a result of the 1994 events quite separate from any emotional injury he sustained in 1987. Given Dr. Johnson's contention that the 1994 denial was based at least in part on the defendants' 1987 actions, the question whether these defendants may be held liable under Section 1981 for emotional distress suffered in and after 1994 presents essentially an issue of causation—whether the alleged actions of Drs. Berson and Winikoff and Mr. Dawson in 1987 were a substantial factor in producing the alleged incremental emotional injury in 1994. That is quintessentially a jury issue. Accordingly, defendants' motion for partial summary judgment dismissing Count III of the complaint as to Drs. Berson and Winikoff and Mr. Dawson is granted except insofar as Dr. Johnson seeks recovery for emotional distress allegedly sustained as a result of the 1994 denial.

Count IV, the Section 1985(3) conspiracy claim, presents a rather different issue. The complaint alleges that Drs. Berson and Winikoff and Mr. Dawson joined a racially motivated conspiracy to remove Dr. Johnson from the vascular/thoracic surgery staff. Plaintiff asserts, moreover, that the 1994 reinstatement denial was in furtherance of that conspiracy.

A conspiracy of course is a partnership the object of which is the achievement of an unlawful or improper objective. *See, e.g., Pinkerton v. United States,* 328 U.S. 640, 644, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946). One who forms or joins it is liable for all of the acts committed in furtherance of the conspiracy by any of the conspirators. *Id.* at 646–47, 66 S.Ct. at 1183–84. Moreover, once having joined a conspiracy, each conspirator is presumed to continue as a member until the conspiracy ends with its abandonment or the accomplishment of its unlawful purpose or until the conspirator withdraws by some affirmative act.[8]

Here, Drs. Berson and Winikoff and Mr. Dawson allegedly became members of the asserted conspiracy in 1987. They have presented no evidence sufficient to establish withdrawal under the standards governing in this Circuit.[9] The questions whether the alleged conspiracy existed and, if so, whether the 1994 reinstatement denial was in furtherance of such a conspiracy as opposed to an independent event for which the parties to the alleged 1987 conspiracy may bear no responsibility are not ripe for disposition on this motion. Accordingly, insofar as Drs. Berson and Winikoff and Mr. Dawson seek dismissal of the Section 1985(3) claim on the ground that the complaint alleges no actions by them subsequent to 1987, their motion must be denied.

### B.

The fourth defendant as to whom dismissal is sought is Dr. Steinglass, whose situation is not entirely comparable to the other three individuals in that Dr. Johnson contends that Dr. Steinglass played "an integral role" in the 1994 decision (Pl.Mem. 6), a contention that, in view of what has been said already, affects only the Section 1981 claim. Given that Dr. Steinglass' motion is supported by an affidavit which states unequivocally that he in effect recused himself and took no part in the denial of Dr. Johnson's 1994 application in view of Dr. Johnson's repeated accusations against him (Steinglass Aff. ¶ 70)—an assertion supported by affidavits of Drs. Simon (Simon Aff. ¶ 23) and Menitove (Menitove Aff. ¶¶ 2–5)—it was Dr. Johnson's burden to come forward with admissible evidence which, if credited, would permit a trier of fact to find that Dr. Steinglass was involved.

---

8. *E.g., United States v. Chalarca,* 95 F.3d 239, 243 (2d Cir.1996) (conspiracy continues until abandoned or objective accomplished); *United States v. Greenfield,* 44 F.3d 1141, 1149–50 (2d Cir.1995) (withdrawal); *United States v. Rucker,* 586 F.2d 899, 906 (conspiracy continues until consummated, abandoned or terminated by affirmative act).

9. *See, e.g., Greenfield, supra* n. 8, 44 F.3d at 1149–50; *United States v. Jones,* 27 F.3d 50, 51 (2d Cir.1994).

Plaintiff makes three arguments. These contentions, whether taken individually or together, are insufficient to raise a genuine issue of material fact.

Dr. Johnson first contends that Dr. Steinglass was a member of the Quality Assurance/Risk Management Committee, which voted in 1994 to deny Dr. Johnson's reinstatement application. That is undisputed. It is undisputed also, however, that Dr. Steinglass did not participate in any way the Committee's consideration of Dr. Johnson's application. The fact that he was present is of no moment because other matters were discussed in other portions of the meeting, and there is no question that he said nothing concerning Dr. Johnson's situation. (Menitove Aff. ¶¶ 2–5) Indeed, Dr. Johnson's brief essentially admits as much. (Pl.Mem. 7) ("it appears that Dr. Steinglass chose to remain silent")

Dr. Johnson next relies upon Dr. Steinglass' alleged failure to advise the various Nyack committees and the Board of Trustees who acted upon the 1994 application that proceedings that had taken place before the New York State Office of Professional Medical Conduct ("OPMC") demonstrated that Nyack's 1987 revocation, in which Dr. Steinglass played an important role, was "a sham." (*Id.* 6–7) This is a most peculiar argument. The OPMC decision was rendered on May 6, 1993. *Johnson II,* 891 F.Supp. at 158. Dr. Johnson applied for reinstatement at Nyack in January 1994, eight months later. (Johnson Decl., Mar. 28, 1995, ¶ 129) His submission included the OPMC findings. (*Id.* ¶ 132) The notion that Dr. Steinglass violated Dr. Johnson's civil rights by failing to tell Nyack Hospital and its various boards of the OPMC decision of which they were fully aware simply defies reason.

Finally, Dr. Johnson relies on the fact that Dr. Steinglass was present to testify at a December 1994 hearing concerning the 1994 denial. (*Id.* 6) The hearing in question was conducted by former Judge Conboy of this Court, who acted as a hearing officer pursuant to the Hospital's by-laws. The question whether he would hear evidence concerning the 1987 events had not been determined by the time of the December 1994 hearing. Accordingly, Dr. Steinglass attended in case his testimony was required, although he did not in fact testify. This is insufficient to raise an issue of fact as to Dr. Steinglass' alleged participation in the 1994 denial.

These contentions having been put aside, Dr. Steinglass' situation is analytically identical, for purposes of this aspect of the motion, to that of Drs. Berson and Winikoff and Mr. Dawson. The Section 1981 claim against him must be dismissed except to the extent that Dr. Johnson seeks to recover for emotional harm suffered as a result of the 1994 decision. The issue whether any such harm was a proximate consequence of actions by Dr. Steinglass will be for the jury. There is no basis for dismissing the Section 1985(3) claim against him for the reasons already discussed unless it be defendants' intraenterprise conspiracy argument, to which the Court now turns.

## II

Defendants contend that the Section 1985(3) claim must be dismissed pursuant to the intraenterprise conspiracy doctrine because all of the conduct complained of was that of employees or members of the medical staff of Nyack Hospital acting in those capacities. In substance, they argue that Nyack Hospital cannot conspire with itself.

The intraenterprise conspiracy doctrine is drawn from Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits contracts, combinations and conspiracies in restraint of trade. The evil to which that statute is directed is concerted decisions of two or more business entities to take action "that, in a competitive world, each would take separately." *Stathos v. Bowden,* 728 F.2d 15, 21 (1st Cir.1984) (Breyer, J.) In consequence, the statutory requirement of a plurality of actors is not satisfied by joint action of wholly owned subsidiaries of a single entity, unincorporated divisions of a company, or employees of a single entity acting within the scope of their employment. *E.g., Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628

(1984); VII Phillip E. Areeda, Antitrust Law ¶¶ 1462–74 (1986) ("Areeda").

Efforts to import this principle to Section 1985(3) have met with varying results. Some circuits have rejected it outright or confined it to the narrowest of circumstances.[10] Others, however, have restricted Section 1985(3) on the basis of the antitrust analogy.[11] The Second Circuit falls into this group, although the extent of its restriction of Section 1985(3) claims is yet to be fully defined.

In *Girard v. 94th Street and Fifth Avenue Corp.*, 530 F.2d 66 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976), the plaintiff charged a cooperative apartment corporation and its directors with having declined to approve the assignment of a lease to her on the ground of her gender. A divided panel of the Second Circuit affirmed dismissal of the Section 1985(3) claim, essentially on the view that the corporation and its directors, who it viewed as having been sued only for actions taken in their capacities as such, were incapable as a matter of law of forming a Section 1985(3) conspiracy. *Id.* at 71–72. In doing so, however, it noted that the action complained was that of a single policy making body—the board of directors—and laid considerable emphasis on the fact that none of the individual defendants was alleged to have been "motivated by any independent personal stake in achieving the corporation's objective." *Id.* See also *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978) (law school faculty and trustees incapable of conspiring to discharge professor).[12]

■ Plaintiff seizes on this latter comment to argue that his claim comes within *Girard* because the requisite independent personal motive is supplied by personal racial bias. (Pl.Mem. 15–16) The argument, however, is without merit. In *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court held that "racial, or perhaps otherwise class-based, invidiously discriminatory animus" must motivate the defendants in order to give rise to Section 1985(3) liability. *Id.* at 102, 91 S.Ct. at 1798. If personal racial bias were sufficient to defeat the intraenterprise conspiracy doctrine, the exception would swallow the rule, and *Girard* and *Herrmann* would be meaningless.[13] Accordingly, this Court holds that personal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine where, as here, the action complained of arguably served a legitimate interest of Nyack Hospital. *Accord, Hartman*, 4 F.3d at 470; *Robins v. Max Mara U.S.A., Inc.*, 914 F.Supp. 1006, 1010 (S.D.N.Y.1996).

■ Plaintiff next argues that the intraenterprise conspiracy doctrine should be limited in the Section 1985(3) context to circumstances in which the alleged conspiracy

---

**10.** *E.g., Stathos*, 728 F.2d at 21 (doctrine limited to ministerial acts to carry out a single discretionary decision); *Novotny v. Great Am. Fed. Sav. & Loan Assn.*, 584 F.2d 1235, 1259 (3d Cir.1978) (rejecting doctrine), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

**11.** *E.g., Hartman v. Board of Trustees of Comm. Coll. Dist. No. 508*, 4 F.3d 465, 469 (7th Cir. 1992) (managers of corporation pursuing its lawful business not rendered conspirators by discriminatory actions); *Travis v. Gary Community Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir.1990); *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir.1985); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir.1972) (Stevens, J.).

**12.** Dr. Johnson contends that the intraenterprise conspiracy doctrine should not apply here because the policies that produced it cannot properly be translated from antitrust to the civil rights field. *See, e.g., Stathos*, 728 F.2d at 21; *Novotny*, 584 F.2d at 1256–59. *Girard* and *Herrmann* foreclose the argument before this Court.

**13.** Plaintiff's reliance on *Garza v. City of Omaha*, 814 F.2d 553 (8th Cir.1987), is misplaced. While *Garza* did find the intraenterprise conspiracy doctrine inapplicable, it did so principally because there was evidence that the individual defendants acted out of "personal animosity." *Id.* at 557. To be sure, the panel referred also to evidence of personal bias. But it did not address the point here presented. To whatever extent it is fairly read as supporting plaintiff's position, the Court declines to follow it for the reason adduced in the text. Cases such as *Walker v. Woodward Governor Co.*, 631 F.Supp. 91 (N.D.Ill. 1986), also relied upon by plaintiff, which reject the intraenterprise conspiracy doctrine in the Section 1985(3) context are inconsistent with *Girard* and *Herrmann* and therefore inapplicable in this Circuit.

encompassed no more than a single act of discrimination.[14] There are, to be sure, such suggestions in the cases.[15] As Judge Easterbrook and others have pointed out, however, "such a line responds neither to the text nor to the objectives of Section § 1985. Section 1985 depends on multiple actors, not on multiple acts of discrimination or retaliation." *Travis*, 921 F.2d at 111.[16]

Finally, plaintiff argues that hospitals and their medical staffs are capable of conspiring in violation of Section 1 of the Sherman Act and, in consequence, that his Section 1985(3) claim therefore would be sufficient even if the intraenterprise conspiracy doctrine were imported wholesale from the law of antitrust. (Pl.Mem. 19–20) Although not phrased as such, the argument is a variation on the personal interest exception to the intraenterprise conspiracy doctrine alluded to in *Girard*.

In dealing with alleged antitrust conspiracies involving hospital medical staffs and hospitals, it is important to bear in mind that some physicians are hospital employees while others have independent practices. In the ordinary peer review or staff privileges dispute, physicians who are hospital employees rarely if ever will have interests separate from those of the hospitals that employ them and therefore rarely will be capable of conspiring with the hospitals or, for that matter, among themselves when they play their roles in the review or privileging process. Their interests and those of their hospitals and colleagues all will be congruent. Physicians with independent practices, on the other hand, present a more nuanced situation. Rarely will such physicians be in competition with the hospitals at which they practice. Some, however, will be competitors among themselves (e.g., two orthopedists) while others will not (e.g., an obstetrician and a radiologist). The degree to which private practitioners functioning in a peer review or staff privileges context may be capable of conspiring depends upon whether their private interests diverge from those of the hospital or the physician who is the focus of attention. VII AREEDA ¶ 1471e & ¶ 1471'b (1996 Supp.)

This view is borne out by the cases. The Second, Fourth and Eleventh Circuits, for example, have held that members of hospital medical staffs are capable of conspiring with one another in view of their separate and possibly competitive private economic interests.[17]

■ Here, none of the individual defendants save Dr. Steinglass is alleged to have been a competitor of Dr. Johnson. Thus, none had any economic interest in whether his vascular/thoracic surgery privileges were revoked in 1987. Their participation in the process was solely in their capacities as members of the hospital medical staff or hospital officials. They and the hospital therefore are indistinguishable for purposes of conspiracy analysis.

■ Dr. Steinglass presents a different problem. He headed Rockland Thoracic Associates, P.C., a group practice engaged in vascular and thoracic surgery which competed with Dr. Johnson. Dr. Steinglass and Dr. Johnson allegedly were two of the three vascular/thoracic surgeons with the relevant operating privileges at Nyack Hospital. He

---

14. Plaintiff actually contends that it should be confined to cases involving "no more than a single act of discrimination *by a single defendant.*" (Pl.Mem. 16) (emphasis added) As a conspiracy requires at least two actors, however, the suggestion of limitation to situations involving only one defendant makes little sense.

15. *See, e.g., Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir.1988); *Stathos*, 728 F.2d at 21; *Wahad v. Federal Bureau of Investigation*, 813 F.Supp. 224, 232 (S.D.N.Y.1993); *Rackin v. University of Pennsylvania*, 386 F.Supp. 992, 1005 (E.D.Pa. 1974).

16. *Accord*, Comment, *The Intracorporate Conspiracy Doctrine and 42 U.S.C. § 1985(3): The Origi-

*nal Intent*, 90 Nw.U.L.Rev. 1125, 1159–60 (1996); Note, *Intracorporate Conspiracies Under 42 U.S.C. § 1985(c)*, 92 HARV.L.REV. 470, 472–73 (1978).

17. *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*, 996 F.2d 537, 544 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993); *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 706 (4th Cir.) (en banc), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992); *Bolt v. Halifax Hospital Medical Center*, 891 F.2d 810, 819 (11th Cir.), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990).

therefore had a personal interest sufficient to take him out of the intraenterprise conspiracy doctrine. The question therefore becomes whether his personal interest permits the conclusion that he conspired with Nyack Hospital, which for purposes of this analysis includes the other individuals acting on its behalf.

The cases are divided on the question whether a hospital is capable of conspiring with members of its medical staff.[18] The Second Circuit has not yet ruled on the point. The answer, however, should depend upon straightforward application of the law of conspiracy to the specific facts of each case.

Dr. Steinglass' alleged personal interest in depriving Dr. Johnson of vascular/thoracic surgery privileges destroys his unity of interest with Nyack Hospital and thus renders him capable of conspiring with it. In order to make out a conspiracy case against these two defendants, however, Dr. Johnson must show that they entered into an agreement to achieve an illicit objective, here the deprivation on the basis of race of rights guaranteed by law. In other words, the plaintiff will have to demonstrate that Dr. Steinglass and one or more agents of the hospital, acting within the scope of their employment, agreed to revoke Dr. Johnson's privileges on the basis of his race.[19] As defendants have argued only that Dr. Steinglass and Nyack are incapable of conspiring as a matter of law, a proposition which this Court rejects, the question whether the evidence would permit such a conclusion as a matter of fact has not been addressed. Accordingly, the motion for summary judgment dismissing the Section 1985(3) claim as to Dr. Steinglass and Nyack Hospital must be denied.

### Conclusion

For the foregoing reasons, defendants' motion for partial summary judgment is granted to the extent that (1) Count III is dismissed as against Drs. Berson, Steinglass and Winikoff and Mr. Dawson except insofar as plaintiff seeks recovery for emotional distress in connection with the 1994 reinstatement denial, and (2) Count IV is dismissed as against all defendants except Dr. Steinglass and Nyack Hospital. The motion is denied in all other respects. Plaintiff's motion for leave to file the second amended complaint is granted. The pleading is deemed served and filed as of this date.

SO ORDERED.

---

**18.** *Compare, e.g., Okusami v. Psychiatric Inst. of Washington,* 959 F.2d 1062, 1065 (D.C.Cir.1992) (hospital and medical staff incapable of conspiracy if they have unity of interest); *Oksanen,* 945 F.2d at 705 (medical staff members incapable of conspiring with hospital to deny privileges where board of trustees final decision maker); *Nurse Midwifery Assoc. v. Hibbett,* 918 F.2d 605 (6th Cir.1990), *mod. on rehearing,* 927 F.2d 904 (6th Cir.1991), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991) (medical staff members incapable of conspiracy with hospital in denying staff privileges); *Nanavati v. Burdette Tomlin Mem. Hosp.,* 857 F.2d 96, 118 (3d Cir. 1988), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989) (same); *Potters Med. Ctr. v. City Hosp. Assn.,* 800 F.2d 568, 573 (6th Cir.1986) (same); *Weiss v. York Hosp.,* 745 F.2d 786, 816–17 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) (same); *with Bolt,* 891 F.2d 810 (medical staff members with private practices capable of conspiring with hospital); *Oltz v. St. Peter's Comm. Hosp.,* 861 F.2d 1440 (9th Cir.1988) (same).

**19.** Section 1985(3) does not reach "conspiracies motivated by economic or commercial animus." *United Bhd. of Carpenters and Joiners,* 463 U.S. 825, 837–39, 103 S.Ct. 3352, 3354, 77 L.Ed.2d 1049 (1983). Thus, while the divergence of Dr. Steinglass' economic interests from those of the hospital render them capable of conspiring, plaintiff nevertheless will have to prove that they entered into a racially, as opposed to economically, motivated conspiracy in order to prevail on Count IV.