**George P. RONIGER, Plaintiff,**

v.

**H. Carl McCALL, individually and as Comptroller of the State of New York, and Rosemary Scanlon, individually and as State Deputy Comptroller for the City of New York, Defendants.**

**No. 97 Civ. 8009(RWS).**

United States District Court,
S.D. New York.

Dec. 1, 1999.

Beranbaum Menken Ben–Asher & Fishel, New York City, John A. Beranbaum, of counsel, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Debo P. Adegbile, Robert S. Smith, Maria H. Keane, of counsel, for defendants.

## OPINION

SWEET, District Judge.

Defendants H. Carl McCall ("McCall"), Comptroller of the State of New York, and Rosemary Scanlon ("Scanlon") (collectively the "Defendants") have moved, pursuant to Rule 56(b), Fed.R.Civ.P., for partial summary judgment dismissing the conspiracy claim brought by plaintiff George P. Roniger ("Roniger") under 42 U.S.C. § 1985(2). For the reasons set forth below, the motion is denied.

### Facts and Prior Proceedings

The facts, parties, and prior proceedings in this case have been set forth more fully in a prior opinion of the Court, familiarity with which is assumed. *See Roniger v. McCall,* 22 F.Supp.2d 156 (S.D.N.Y.1998) (*Roniger I* ).

On October 29, 1997, Roniger filed his original complaint in this action, asserting causes of action under 42 U.S.C. § 1983 and § 1985(2). Roniger's First Amended Complaint (the "Complaint") was filed on May 8, 1998.

From May of 1993 until approximately December 1, 1994, Roniger was employed in the Office of the State Deputy Comptroller for the City of New York ("OSDC")—a division of the Office of the State Comptroller ("OSC"). As was set forth in more detail in *Roniger I,* Roniger has alleged in this action that he was terminated from his position at the OSDC as a result of his politically embarrassing statements in deposition testimony concerning a June 29, 1993 letter (the "June 1993 letter") that Comptroller McCall sent to then—Mayor Dinkins in connection with the City's efforts to prevent a downgrading of its bond rating. In that letter, McCall made a variety of representations to Dinkins concerning the state of the City's budget. The City ultimately utilized the Comptroller's positive statements in that letter in remonstrating for the maintenance of its "A−" bond rating by Standard & Poors.

The lawsuit in which Roniger had been called to testify involved accusations by former OSDC personnel that they had been improperly fired because of McCall's alleged politicization of the OSC, and because of their pointed criticism of the City's budget in a draft OSC report. Several fired employees filed suit against McCall in federal court for wrongful termination and retaliation, claiming that they had been discharged for truthfully assessing the fiscal position of New York City at a time when McCall had political reasons to downplay the City's financial difficulties.

*See Westmeyer v. McCall*, No. 93 Civ. 8226(JSM) (hereinafter the "Westmeyer Lawsuit"); *see also Fry v. McCall*, No. 95 Civ.1915(JFK). The plaintiffs in the Westmeyer Lawsuit claimed that they had been discharged for political reasons, and that McCall had sought to influence their reports in order to help Dinkins' reelection chances.

On August 12, 1994, approximately three months before McCall faced reelection for Comptroller, the plaintiffs in the Westmeyer Lawsuit deposed Roniger. Roniger was questioned at length about the June 1993 Letter, and it was during this questioning that his only criticism of McCall was voiced. As the deposition transcript reveals, Roniger expressed the view that the Comptroller's June 1993 letter was too soft on the City:

> Q: Do you know whether the portions of the letter that you saw conformed to the statements contained in the various reports sent out by the Comptroller's office concerning the City financial plan?
>
> A: As I recall from a distance, it was my view that the letter took too soft a position vis-a-vis the City.
>
> Q: In what respect?
>
> A: I can't answer that question because I don't remember the language. It's been too long.
>
> Q: I don't want to put words in your mouth. You are here to testify, not me. But do you mean it was not critical enough of the City's financial plan?
>
> A: In my view, the City's position was somewhat more difficult than what I recall the letter suggested.

Shortly thereafter, on September 14, 1994, the *Bond Buyer*, a newspaper serving the New York financial community, published an article headlined, "State Comptroller Downplayed Plight of N.Y.C. Budget Woes, Top Aide Says." The *Bond Buyer* story stated, in relevant part:

> [G]eorge Roniger ... recently said he had misgivings about the letter's content, and specifically, its description of the city's fiscal situation. . . .
>
> [S]everal fiscal analysts interviewed for this article said the letter is unusual because it soft-pedals many of the city's fiscal woes, and because it was written with the assistance of city officials. Parts of the letter even run counter to the tone and substance of reports produced by McCall's New York City Budget Office. . . .

In his testimony, McCall said Roniger was responsible for "validity of any document that we produced that he was involved in."

The *Bond Buyer* story was picked up by other newspapers, and the New York Post severely criticized both the substance of the June 1993 letter and the process by which the letter was allegedly produced— the submission of a draft letter by the City. The June 1993 Letter became the source of criticism of McCall in his successful 1994 campaign for Comptroller.

According to Roniger, in the wake of the negative publicity surrounding his testimony in the Westmeyer Lawsuit, McCall and Scanlon—who was then head of the OSDC—conspired to humiliate Roniger and to remove him from the Comptroller's Office. Though the record appears somewhat unclear concerning the specifics of Roniger's discharge, it is not disputed that he was notified of his dismissal from his position on December 1, 1994. The "effective date" of his termination was February 10, 1995. Both Scanlon and McCall were employees of the OSC at the time Roniger was terminated, though Scanlon has since left her position at that office.

In *Roniger I*, it was held that Roniger's § 1983 claims against both McCall and Scanlon in their individual capacities would be dismissed under the doctrine of "qualified immunity," given that, as a policymaker, Roniger's asserted First Amendment right was not clearly established in 1994. 22 F.Supp.2d at 166. *Roniger I* also held,

however, that Roniger had stated a claim against McCall under § 1983 in his official capacity, though the official-capacity claim against Scanlon was dismissed since she had ceased to be employed by the OSC in 1997. *See id.* at 161.

More importantly for the purposes of the instant motion, *Roniger I* left open the question of whether Roniger could maintain his § 1985(2) claim against McCall and Scanlon, given that both were employed by OSC at the time Roniger suffered an adverse employment action. *See id.* at 169.

The Defendants filed their motion for partial summary judgment on June 21, 1999. Oral argument was heard on September 15, at which time the motion was deemed fully submitted.

### Discussion

#### I. *Rule 56(b)*

Under Rule 56(b), Fed.R.Civ.P., a "party against whom a claim, counterclaim, or cross-claim is asserted ... may, at any time, move ... for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate, however, only where the evidence is such that a reasonable jury could not return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56(c), Fed.R.Civ.P., it shall be rendered "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Second Circuit has explained:

> "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." However, where the nonmoving party will bear the burden of

proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.

*Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (*quoting Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988)) (internal citations omitted).

#### II. *Summary Judgment Shall Not Be Granted In Favor of Defendants Concerning Roniger's § 1985(2) Claim*

At the outset, it is important to emphasize the discrete nature of the matter under consideration in connection with Defendants' present motion. Roniger's remaining § 1983 claim against McCall in his official capacity is not at issue. The only matter presently before the Court is Roniger's § 1985 claim. Thus, while the parties have submitted a significant amount of material that would appear to refer to the vitality of Roniger's underlying § 1983 claims, it is the question of conspiracy that is addressed herein.

42 U.S.C. § 1985(2) provides in pertinent part:

> [I]f two or more persons in any State or territory conspire to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation against any one or more of the conspirators.

As was discussed in detail in *Roniger I*, the Defendants contend that Roniger's claim under this section must be dismissed pursuant to the "intraenterprise" or "intracorporate" conspiracy doctrine, as the conduct complained of was really that of a single entity—the OSC.

As was stated by the court in *Johnson v. Nyack Hospital,* 954 F.Supp. 717 (S.D.N.Y.1997):

> [t]he intraenterprise conspiracy doctrine is drawn from Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits contracts, combinations and conspiracies in restraint of trade. The evil to which that statute is directed is concerted decisions of two or more business entities to take action "that, in a competitive world, each would take separately." In consequence, the statutory requirement of a plurality of actors is not satisfied by joint action of wholly owned subsidiaries of a single entity, unincorporated divisions of a company, or employees of a single entity acting within the scope of their employment.

*Id.* at 722 (*quoting Stathos v. Bowden,* 728 F.2d 15, 21 (1st Cir.1984)). Though this doctrine had its genesis in antitrust law, and in lawsuits concerning anticompetitive conspiracies between and among corporate actors, it has since been imported into § 1985 jurisprudence. *See Herrmann v. Moore,* 576 F.2d 453, 458 (2d Cir.1978) (holding that plaintiff could not maintain § 1985(2) claim, despite the fact that one of the reasons for his discharge was that he had attended and testified in court, because "[e]very one of the defendants who was involved in the so-called conspiracy was either a trustee or faculty member of the Brooklyn Law School which is admittedly an educational corporation and was acting in that capacity in connection with the discharge."); *Girard v. 94th Street & Fifth Avenue Corp.,* 530 F.2d 66, 71 (2d Cir.1976) (finding that plaintiff's § 1985(3) claim must be dismissed, given that "conspiracy" alleged involved actions by individual defendants in corporate capacities); *Gatling v. The Fashion Ass'n,* No. 98 Civ. 2251(LMM), 1999 WL 637232, at *2–3 (S.D.N.Y. Aug.20, 1999) (finding plaintiff's proposed § 1985 claim to be futile based on intracorporate conspiracy doctrine). The doctrine has been extended to apply to public entities, and to alleged conspiracies involving public employees.

*See Rini v. Zwirn,* 886 F.Supp. 270, 292 (E.D.N.Y.1995) (collecting cases); *see also Allen v. City of Chicago,* 828 F.Supp. 543, 564 (N.D.Ill.1993) (holding, in context of § 1985(3) suit against City of Chicago and various officials, that "[w]hile we believe that plaintiffs have alleged facts indicating that these individuals came to a meeting of the minds concerning unconstitutional conduct, we agree with defendants that the 'intra-corporate conspiracy' theory bars this claim").

The Defendants claim, as they did in connection with *Roniger I,* that Roniger's § 1985 claim cannot lie because, for the purposes of § 1985, both McCall and Scanlon were employees of OSC and therefore one-in-the-same. Just as it takes two to tango, they press, it takes at least two distinct individuals or entities to conspire, and given the context in which Roniger was discharged the intraenterprise conspiracy doctrine does not allow one to consider McCall and Scanlon separately.

As in *Roniger I,* Roniger seizes on the so-called "personal interest" exception to the intraenterprise conspiracy doctrine to ward off dismissal. *See Bond v. Board of Education,* No. 97 CV 1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar.17, 1999); *Quinn v. Nassau Cty. Police Dep't,* 53 F.Supp.2d 347, 360 (E.D.N.Y.1999); *Geiger v. E.I. DuPont Nemours & Co.,* No. 96 Civ. 2757, 1997 WL 83291, at *10 (S.D.N.Y. Feb.14, 1997); *Rini,* 886 F.Supp. at 293; *see also See Perkins v. Gregg County,* No. 6:94 CV 328, 1995 WL 836051, at *6 (E.D.Tex. Dec.6, 1995) (finding that intracorporate conspiracy doctrine does not apply, given plaintiff's pleadings in action against County, its commissioners and other defendants, where Gregg County Commissioner was alleged to have been motivated to retaliate against plaintiff because of plaintiff's cooperation with federal investigators and implication of Commissioner in criminal activity); *Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119, 1127 (10th Cir. 1994) (noting, in case where former Rocky

Flats worker sued employer and former coworkers for engaging in conspiracy to deter her from testifying and to retaliate for her testimony, that personal interest exception would apply where whistleblower plaintiff implicated defendants in criminal activity and statements allegedly made by defendants indicated that "they feared plaintiffs' testimony would lead to the plant's closing and the loss of defendants' jobs"). According to Roniger, his discharge was motivated by personal reasons, not reasons connected to OSC official business. McCall's interest in being reelected Comptroller, in downplaying his allegedly compromised political independence, in vindicating his reputation, and in punishing Roniger for his testimony are asserted to be personal interests distinct from the interests of either Scanlon or the "corporate" objectives of the Comptroller's Office. According to Roniger, the OSC was intended to be non-partisan, and therefore any politically-motivated termination would reflect distinctly personal interests belonging to McCall alone.

By contrast, according to Defendants, even if Roniger's discharge was attributable to the fallout surrounding Roniger's testimony,[1] McCall simply had a personal stake in keeping his job, and in appearing in a favorable light—the same "interest" every employee of every entity has. Moreover, to the extent that any of the evidence submitted by Roniger could allow one to conclude that McCall approved of his discharge because of McCall's personal interest in reelection, Defendants suggest that the intraenterprise conspiracy doctrine could never apply to elected officials if Roniger's position were correct—as all officials facing reelection make decisions, in some way or another, to satisfy the

voting public and to increase their chances of reelection.

In *Roniger I,* resolution of this issue was put off to another day, as it was "not clear that Roniger could prove no set of facts supporting the notion that McCall acted upon some personal motive or in furtherance of a personal—maybe even economic—interest outside of the objectives of the Comptroller's Office in terminating Roniger." 22 F.Supp.2d at 169.

Based on the record presently before the Court, disputed issues of material fact exist concerning the extent to which McCall was motivated by exclusively personal interests when he authorized Roniger's dismissal. While Roniger has not supplied evidence concerning any independent economic interest that McCall might have had in terminating Roniger, the record contains evidence from which a reasonable jury might conclude that Roniger was terminated based on personal interests unconnected with the official interests of the OSC.

A review of the decisions applying the intracorporate conspiracy doctrine reveals a degree of uncertainty in the law. Some courts have appeared to apply the doctrine in strict fashion, whenever the defendants' activities were undertaken within the scope of their official duties. Other courts have either sought to parse the true scope of a defendant's official duties, or determined that a defendant's acts were undertaken for essentially personal reasons— such that the acts about which a plaintiff complains should not be considered merely the acts of a corporate entity acting through its agents or officers. A few other courts have, like this Court, forestalled a decision about the applicability of the doctrine. *See Northen v. City of Chicago,* No. 93 C 7013, 1999 WL 342441, at *3

---

1. It is worth noting that the Defendants do not concede this point, and have submitted a significant amount of evidence from which it could be concluded that Roniger's situation at OSDC had become precarious well before he was ever deposed—as the result of deterioration of the working relationship between him and Scanlon. Indeed, "vent" notes dutifully recorded by Roniger detail his growing dissatisfaction with Scanlon's managerial tactics and travails, and with the marginalization of his own role at OSDC, many months before he testified in the Westmeyer Lawsuit.

(N.D.Ill. May 17, 1999) (denying defendants' motion to dismiss premised upon intracorporate conspiracy doctrine, as plaintiff had alleged that he was falsely arrested in retaliation for criticizing Chicago Police Department; noting that "based on [plaintiff's] allegations, this court cannot determine whether the officers were pursuing lawful police business"); *Yeadon v. New York City Transit Auth.*, 719 F.Supp. 204, 211–12 (S.D.N.Y.1989) (holding that plaintiffs' § 1985 and § 1986 claims could not be dismissed upon 12(b)(6) motion, as they had adequately alleged "independent, personal conspiratorial purposes."). Whether the applicability of the intracorporate conspiracy doctrine is a question of fact or of law is an issue that continues to divide the circuits, and one that also does not appear to have been conclusively resolved within this Circuit. *See Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 126 (2d Cir.1981); *Geiger*, 1997 WL 83291, at *10 n. 3; *Martin Process Co. v. Lee Co.*, No. 81 Civ. 3775(HEW), 1983 WL 1907, at *5 (S.D.N.Y. Sept.14, 1983); *see also Nanavati v. Burdette Tomlin Memorial Hospital*, 645 F.Supp. 1217, 1231 (D.N.J.1986) (discussing trial court's instructions to jury concerning intracorporate conspiracy doctrine, including instruction that a conspiracy may properly be found where alleged conspirator had "private economic motives").

In *Herrmann v. Moore*, the Second Circuit applied the "familiar doctrine" that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." 576 F.2d at 459. In pressing his claims, Roniger asserts that, to apply the intraenterprise conspiracy doctrine whenever a particular set of defendants acted within the scope of their official duties would be to graft an "ill-advised" exception upon the "personal stake" exception that already exists to the doctrine. While this assertion mischaracterizes the specifics of Defendants' position, there is some truth to Roniger's general position that whether or not a particular individual was operating in the scope of his employment is not the only determinative question to be raised when considering the application of the intraenterprise conspiracy doctrine. After all, a wide range of conspiracies may result in adverse employment actions—demotions, terminations, pay reductions, and the like—that are properly within the power of a set of defendants to take. Moreover, if the scope of a Defendant's employment were the only relevant criterion, it is doubtful that the courts would have ever fashioned the so-called "personal interest" exception to the doctrine.[2]

By the same token, however, it should be observed that a promiscuous use of the "personal interest" exception to the doctrine would eviscerate the doctrine as a whole. In *Johnson v. Nyack*, the court responded as follows to a plaintiff's claim that personal racial bias constitutes a personal interest sufficient to block application of the doctrine:

> If personal racial bias were sufficient to defeat the intraenterprise conspiracy doctrine, the exception would swallow the rule, and Girard and Herrmann would be meaningless. Accordingly, this Court holds that personal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine where, as here, the action complained of arguably served a legitimate interest of Nyack Hospital.

954 F.Supp. at 723; *see Bond*, 1999 WL 151702, at *2 ("Although the complaint includes an allegation that Rodriguez–Torres wanted to 'get rid of' plaintiff, personal bias does not constitute personal interest

---

**2.** Of course, it might be observed that application of such an "exception" is merely another way of finding that the employee or officer of a corporate entity was not truly operating in the "scope" of his or her employment, but rather went beyond the scope of his or her employment by making decisions based on exclusively personal interests.

and is not sufficient to defeat the intracorporate conspiracy doctrine."). In the context of § 1985(3) claims based on racial or other discrimination, other courts have observed that the necessity of demonstrating discriminatory animus would render the doctrine meaningless unless the personal stake exception is applied carefully. *See Hartman v. Board of Trustees*, 4 F.3d 465, 470 (7th Cir.1993); *Markham v. White*, No 95 C 2065, 1995 WL 669643, at *5 (N.D.Ill. Nov.8, 1995). By definition, for example, racial discrimination or other types of unconstitutional activity are seldom within a conspiracy defendant's job description.[3] Similarly, an officer or agent's personal financial interests in a matter, distinct from the financial interests of the corporate entity, may constitute a sufficient personal stake in a matter to merit suspension of the doctrine. To some degree or another, however, all individuals have a financial stake in the positions they occupy or the sinecures they hope to obtain. It is for this reason, perhaps, that courts have at times held that an employee must have been motivated "solely" by personal bias or exclusively personal interests in order for the personal interest exception to apply. *See Hartman*, 4 F.3d at 470.

In his submissions, Roniger asserts that, because a New York State agency such as the OSC is proscribed from engaging in partisan politics, and because the State Comptroller is "obliged by the State Constitution to function as [an] independent auditing official for the affairs of the State," any interests McCall might have had in "protecting his political image and settling a political score" were not only

distinct from, but inimical to, the business of the Comptroller's office. However, this begs the very question presented, and Roniger's efforts to resolve a complex matter by way of mere definition are unhelpful—given that the Comptroller, however independent and "nonpartisan," occupies an elected position, and given that even non-elected officials and non-partisan governmental entities can reasonably be expected to react to public criticism based on "corporate" interests. One might just as easily say that the interests of a law school's trustees or faculty members are in running the law school and teaching, not in punishing a fellow faculty member for attending and testifying in court, *but see Herrmann*, 576 F.2d at 458, that the interests of employees of the Department of Children and Family Services (DCFS) are properly in protecting the welfare of children, but not in retaliating against a DCFS caseworker for retaining a lawyer and filing a federal lawsuit, *but see Wright v. Illinois Dep't of Children & Family Services*, 40 F.3d 1492, 1508–09 (7th Cir.1994) (holding that conspiracy alleged "had a rather limited object—stifling [plaintiff's] efforts to air her personal and professional grievances," and finding that doctrine therefore applied), or that the interests of municipal employees do not lie in conspiring to eliminate other employees' positions based on their political affiliation, but rather in doing their assigned tasks with singleminded determination. *But see Rini*, 886 F.Supp. at 291 ("Here it is alleged that the Municipal defendants conspired to develop and approve a budget reduction plan which eliminated plaintiffs' positions [because they were registered Republicans]. Regardless'

---

**3.** Indeed, many of the cases in which the intraenterprise conspiracy doctrine has been found *not* to apply are cases involving claims of racial or other invidious discrimination. *See Quinn*, 53 F.Supp.2d at 360 (finding that police officer who abused plaintiff officer based on his sexual orientation pursued "personal interests wholly separate and apart from the entity," and that "personal interest" exception to doctrine therefore applied); *McCraven v. City of Chicago*, 18 F.Supp.2d 877, 884 (N.D.Ill.1998) (holding that police

department's race-based treatment of plaintiff was "sufficient to take this case outside the intracorporate immunity doctrine"); *Salto v. Mercado*, No. 96 C 7168, 1997 WL 222874, at *2 (N.D.Ill. Apr.24, 1997) ("Here, Salto alleges that defendants conspired to physically abuse and falsely arrest him in retaliation for complaining of police misconduct and for filing a civil lawsuit. These allegations, if true ... would demonstrate that the defendants were motivated solely by personal bias.").

of the motive or intent supporting the legislation, these are acts within the scope of their official duties. Therefore, the § 1985 claims against the Municipal defendants in their individual capacities must be dismissed, as a matter of law, as the allegation that their acts in furtherance of the conspiracy were solely within the scope of their duties as officials or employees of the Town."). Thorny questions about the application ·of the intraenterprise conspiracy doctrine are not so easily dispatched.

Nevertheless, there is truth to Roniger's observation that McCall may, on certain occasions, act as Comptroller McCall, and on other occasions act as either private citizen McCall or candidate McCall. The Comptroller's personal interests in his reelection and in his reputation, for example, may be distinct from his official interests in managing OSDC's personnel, defending the institutional integrity of the OSC, or even in retaliating for public criticism of that Office. In practice, it may be rather difficult to determine whether an elected official was acting as an official or as a candidate, pursuant to personal or public interests. However, this does not mean that the inquiry should be abandoned, and the intracorporate conspiracy doctrine applied automatically.

Given the record before the Court, it cannot be said that no material issues of fact exist as to whether the Comptroller's decision to fire Roniger was motivated solely by personal interests distinct from those of the OSC. To the extent that Roniger has contended that McCall had a distinctly personal interest in firing Roniger because of the "damage done to his reputation as a trustworthy person," the lion's share of evidence Roniger has offered in support of this proposition concerns alleged discrepancies in deposition testimony that would only have become apparent well after the decision to terminate Roniger had been made. Furthermore, much of the evidence submitted would be consistent with a determination that McCall was not motivated by personal interests, but rather by the interests of the OSC itself. Nevertheless, the record contains enough evidence concerning the political fallout following Roniger's deposition testimony, the timing of Roniger's firing, and McCall's handling of Roniger's discharge from which it could be inferred that Roniger was ultimately fired because of McCall's own personal interests in his reelection and reputation, and to obtain retribution against Roniger as a result of personal embarrassment over the publicity surrounding Roniger's testimony. Such disputed factual issues do not lend themselves to easy resolution by a court upon a motion for summary judgment, but rather are best left to a jury.

### Conclusion

For the reasons stated above, the Defendants' motion for partial summary judgment shall be denied.

It is so ordered.