**Stella STATHOS, et al., Plaintiffs, Appellees,**

v.

**Russell E. BOWDEN, et al., Defendants, Appellants.**

**No. 82–1777.**

United States Court of Appeals, First Circuit.

Argued Dec. 8, 1983.

Decided Feb. 22, 1984.

See also, D.C., 514 F.Supp. 1288.

Timothy J. O'Keefe, Peabody, Mass., with whom Murphy, Ryan & O'Keefe, Peabody, Mass., and Christine A. McClave, Woburn, Mass., were on brief, for defendants, appellants.

G. Rosalyn Johnson, Lynn, Mass., with whom Kevin G. Powers and Johnson & Powers, P.C., Lynn, Mass., were on brief, for plaintiffs, appellees.

Before COFFIN and BREYER, Circuit Judges, and MALETZ,* Senior Judge.

BREYER, Circuit Judge.

Plaintiffs Stella Stathos and Gloria Bailey sued the Peabody Municipal Lighting Commission (a governmental body) and several of its elected Commissioners, charging discrimination on the basis of sex. Plaintiffs claimed that the defendants' actions violated both 42 U.S.C. § 1983, which makes it unlawful for any person acting under color of state law to deprive "any citizen ... of any rights ... secured by the Constitution ...," and 42 U.S.C. § 1985(3), which forbids "two or more persons" to "conspire ... for the purpose of depriving ... any person ... of the equal protection of the laws ...." A jury found for the plaintiffs and defendants appeal.

The record, with inferences drawn in plaintiffs' favor, *Bayamon Thom McAn, Inc. v. Miranda,* 409 F.2d 968, 969 (1st Cir. 1969), shows essentially the following facts. For many years, Stathos worked for the Peabody Municipal Lighting Plant ("PMLP") as "principal clerk and secretary" and Bailey as "clerk typist." In 1977, PMLP's manager divided the plant into four departments: generation, electrical engineering, distribution, and business office. He drew up a chart, which reflected, more accurately than their job titles, his view of plaintiffs' actual status and duties. On the chart, Stathos appeared as head of the business office, reporting directly to the plant manager, and Bailey reported directly to Stathos. Stathos, as of 1978, was paid $15,819 per year; Bailey, $13,816. Men, paid $27,139 per year, ran each of the other three departments, while men, paid $25,201 per year, reported directly to them. The manager believed the chart's suggested equivalence of rank and duty was accurate; he recommended that the Commission raise the salaries of Stathos and Bailey, paying them what other heads and assistant heads received—an increase of about $12,000 per year for each of them.

The Commission considered the manager's recommendations in the fall of 1978. On October 12th, the Commission discussed, not the merits of the issue, but the fact that the pay proposal had "leaked" to the press. On November 28th, the Commission voted to deny the proposal; it also voted to deny Stathos and Bailey a small 5 percent pay increase; but it directed that a Commission committee study the proposal. Evidently it never undertook a formal study.

* Of the United States Court of International Trade, sitting by designation.

In March 1979, the Commission again considered plaintiffs' pay. It rejected a series of compromises that PMLP's manager offered. It decided, however, to create a new "office unit" and to make Stathos the "office manager" and Bailey her "administrative assistant." It voted them pay increases that narrowed the pay gap between the first and second "office" positions and those in "generating," "engineering," and "distribution" from about $12,000 to about $9,000.

In January 1980, the Commission hired a professional management group, Olney Associates, to describe, compare, and suggest pay for 35 PMLP positions. The Olney report rated Stathos's job at "16," equal to the number two positions in the "generating" and "engineering" departments, and midway between number one (at "18") and number two (at "14") in "distribution." The report also recommended pay increases for Stathos and Bailey. The Commission adopted the report, but denied Stathos and Bailey the recommended pay increases, leaving them the only executives paid less than the report recommended.

In the summer of 1980, Bailey asked the manager to change her title because it was shortly to lose Civil Service protection. The manager agreed and persuaded the Commission to vote 4–1 in favor of such a change. When Bailey later asked the dissenting Commissioner why he had voted 'no,' he answered that he thought the "girls" were asking for too much money and should not have filed suit. He also remarked that the Commission's vote would change because he had talked to one of the other Commissioners. That evening the Commission voted 4–1 to deny the change in title.

In July 1981, the manager recommended raising Stathos's and Bailey's grades. The Commission kept Stathos at 16 but raised Bailey to 14. It then voted them pay increases, but because it also raised the pay of positions one and two in the other departments, it preserved the pay disparity.

The plaintiffs presented other evidence designed to show deliberate intent to discriminate on the basis of sex. Defendants, of course, presented evidence designed to show the contrary. The case was well tried in the district court. And although we consider each of defendants' arguments for error, we see no need to discuss the facts and evidence in detail.

■ 1. Defendants argue that the district court should not have excluded six studies prepared by their statistical expert, Thomas Marx. Marx presented nine studies. The court allowed him to testify as to three. These three compared (i) percentage raises that PMLP gave plaintiffs and their male PMLP counterparts from June 1969 to June 1982 and (ii) percentage raises that PMLP gave each of these groups on account of job promotions from 1973 to 1982. The third study compared two salary relationships: (i) Stathos's salary as a percentage of other top PMLP salaries with (ii) former male PMLP office managers' salaries as a percentage of the same top PMLP salaries.

The six studies that the court rejected involved comparisons between plaintiffs' salaries and salaries in other Massachusetts municipal electric companies. They can be described most easily by designating the positions compared as follows:

Plant Manager—M
Head Office Manager—$O_1$
Assistant Office Manager—$O_2$
Superintendent of Electrical Distribution—E

$O_1$ and $O_2$ at PMLP are Stathos and Bailey.

The six studies made the following salary comparisons:

1) $O_1$ and $O_2$ at PMLP to male $O_1$ and $O_2$ at other Massachusetts municipal light plants;
2) the relationships at PMLP of $O_1$ and $O_2$ to E and M with the relationship elsewhere of male $O_1$ and $O_2$ to E and M;
3) $O_1$ at PMLP to female $O_1$ elsewhere;
4) the relationship at PMLP of $O_1$ to M with the relationship elsewhere of female $O_1$ to male M;
5) $O_1$ and $O_2$ at PMLP to $O_1$ and $O_2$ elsewhere;

6) the relationship at PMLP of $O_1$ and $O_2$ to E and M with the relationships elsewhere of $O_1$ and $O_2$ to male E and M. The district court found these six studies irrelevant. And we agree.

The two basic issues in the case were (i) did defendants discriminate and (ii) was any discrimination intentional. *See Personnel Administrator v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 238–48, 96 S.Ct. 2040, 2046–51, 48 L.Ed.2d 597 (1976). Defendants concede that the studies are not relevant to the second issue, for there is no evidence that they seriously considered salary levels or salary relationships at other plants when they set plaintiffs' salaries. The studies are also irrelevant to the first issue, for no one complains of discrimination between $O_1$ and $O_2$ at PMLP and salaries paid *anyone* at any other plant. The discrimination at issue concerns how defendants actually treated plaintiffs as holders of the $O_1$ and $O_2$ jobs and how they *would have treated* two men holding these same positions. The evidence of discrimination consisted of showing how defendants treated plaintiffs compared with how they treated men elsewhere in the company. The evidence was highly specific to the individual circumstances at PMLP and the actions that defendants took there. Evidence of what happened at other plants, if relevant at all, is so tangential to the case as tried as to be excludable as a "waste of time" under Fed.R.Evid. 403.

2. Defendants argue that the trial court erred in not answering a question that the jury sent out at some point between 4 p.m. on August 27, 1982, when it retired to deliberate, and 4:45 p.m. The question was "Is it possible to find against the Peabody Municipal Lighting Commission and not the individual Commissioners?" The judge asked the clerk to see if counsel agreed that the answer should be "yes." At 5:15, the clerk told counsel the judge would answer "yes." Court reconvened at 5:23 to send

the answer to the jury. The court was then told that the jury had reached a verdict. The judge said he would receive the verdict and neither side objected.

■ Since defendants did not object to the court's receiving the verdict before answering the question, we review only for "plain error." *See Sibbach v. Wilson & Co.,* 312 U.S. 1, 16, 61 S.Ct. 422, 427, 85 L.Ed. 479 (1941). And we see none. The cases cited by defendants suggest that a trial judge should seek to clear up serious confusion created by his instructions. *United States v. Quintana,* 508 F.2d 867 (7th Cir. 1975); *Powell v. United States,* 347 F.2d 156 (9th Cir.1965). But here the court's instructions were initially clear. And the jury's question suggests no serious or prejudicial confusion. The jury found the individual defendants liable, not only on the § 1983 count (where arguably their individual liability stemmed from that of the Commission) but also on the conspiracy count, as to which the court clearly instructed that only they, not the Commission, could be liable. The court, moreover, instructed that conspiracy liability was strictly "derivative" of § 1983 liability. Thus, the risk that the jury found the individual Commissioners "liable by association" under the § 1983 count is not significant.

■ 3. Defendants argue that the court should have instructed the jury about "good faith" immunity—a defense available to a public official in a "constitutional tort" action brought under § 1983. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see Harlow v. Fitzgerald,* 457 U.S. 800, 818 & n. 30, 102 S.Ct. 2727, 2738 & n. 30, 73 L.Ed.2d 396 (1982). The court instructed the jury that to find defendants liable under § 1983, it must find "first ... that [the plaintiffs] were discriminated against, and ... second ... that each defendant discriminated against them purposefully because they [were] women." In the circumstances of this case, the court felt that a further instruction on "good faith" immunity would have been superfluous. We agree.

In *Harlow v. Fitzgerald, supra,* the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The Court then discussed how a trial court should make this determination:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time [the] action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained.

*Id.* at 818–19, 102 S.Ct. at 2739 (footnote omitted).

Under the court's instructions, to find liability under § 1983 the jury had to find that the defendants "purposefully" discriminated against plaintiffs "because they [were] women." And the court defined "discrimination" to mean that "the plaintiffs were treated differently or unequally under the particular relevant circumstances." The law was clear throughout this period that public officials, acting in their official capacities, could not purposely discriminate (in this sense) on the basis of sex. *See Personnel Administrator v. Feeney, supra.*

We do not see how anyone could think that paying women less just because they were women would not constitute this type of unlawful discrimination. Defendants point to no "extraordinary circumstances" or other reasons why they should not have known this. Thus, a special *Harlow* instruction was unnecessary. In fact, defendants' claim of "good faith" seems to amount only to a claim that they did not "purposefully" discriminate. The jury, properly instructed on this issue, found against them.

■ 4. Defendants claim that the evidence that they *conspired* to deprive plaintiffs of equal protection of the laws is inadequate. They argue that, on the basis of the record, a jury could not lawfully have found a conspiracy or acts in furtherance of a conspiracy, as § 1985(3) requires. *See United Brotherhood of Carpenters, Local 610 v. Scott,* —— U.S. ——, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983). We disagree. The record shows that defendants took a series of actions depriving plaintiffs of salary increases; that these actions involved discussions among them; that they took other concerted activity, which was necessary for their actions to be effective; and that they intended the results. Thus, under ordinary conspiracy principles, a jury could plainly impose liability—and there would be no issue—*were a single corporation not involved.* Defendants note, however, that several circuits have held that "if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by [§ 1985(3) ]." *Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir.1972); *accord Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Girard v. 94th Street & Fifth Avenue Corp.,* 530 F.2d 66, 70–72 (2d Cir.), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Baker v. Stuart Broadcasting Co.,* 505 F.2d 181, 183 (8th Cir.1974).

We doubt that this "intracorporate" exception should be read broadly. The cases employing it have rested in large part on precedent drawn from the antitrust field, where considerations underlying the need

for an "intracorporate" exception to ordinary conspiracy principles are very different. *See* Handler & Smart, *The Present Status of the Intracorporate Conspiracy Doctrine,* 3 Cardozo L.Rev. 23, 72–73 (1981); McQuade, *Conspiracy, Multicorporate Enterprises, and Section 1 of the Sherman Act,* 41 Va.L.Rev. 183, 185 (1955). The evil at which the "conspiracy" section of the Sherman Act, 15 U.S.C. § 1, is aimed is an evil that exists only when two different business *enterprises join* to make a decision, such as fixing a price, that in a competitive world each would take separately. Moreover, an individual decision to do the same thing is not only legitimately socially useful but also may often require joint decision-making by managers within a single enterprise. Where "equal protection" is at issue, however, one cannot readily distinguish in terms of harm between the individual conduct of one enterprise and the joint conduct of several. Nor can one readily identify desirable social conduct as typically engaged in jointly by the officers of a single enterprise. Thus, the boundaries of an "intracorporate" exception to the § 1985(3) conspiracy provision should be narrower than in antitrust. Indeed, we do not see why they should extend—if at all—beyond the ministerial acts of several executives needed to carry out a single discretionary decision. *Cf. Novotny v. Great American Federal Savings & Loan Association,* 584 F.2d 1235 (3rd Cir.1978) (en banc), *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

Regardless, defendants' activities here went beyond "a single act" of discrimination. Their conduct involved a series of acts over time going well beyond simple ratification of a managerial decision by directors. It consisted of joint discretionary activity—with many words and several deeds—engaged in by each of the Commissioners. *Cf. Rackin v. University of Pennsylvania,* 386 F.Supp. 992 (E.D.Pa.1974). Thus, we do not believe any "intracorporate" exception applies.

■ 5. Defendants claim the damage award to each plaintiff of $60,000 in compensatory damages under § 1983 is excessive. The jury, however, by comparing the pay PMLP's manager recommended with what plaintiffs actually received, could have awarded between $33,000 and $35,000 in "lost wages" compensation. Pain, suffering, and related medical expenses could easily account for the rest. Such an award does not "shock[ ] ... the conscience" of the court. *Clark v. Taylor,* 710 F.2d 4, 13 (1st Cir.1983); *Kolb v. Goldring, Inc.,* 694 F.2d 869, 871 (1st Cir.1982); *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico,* 536 F.2d 443, 447 (1st Cir. 1976); *Rivera v. Rederi A/B Nordstjernan,* 456 F.2d 970 (1st Cir.), *cert. denied,* 409 U.S. 876, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972). It is well "within the universe of possible awards that are supported by the evidence ...." *Clark v. Taylor,* 710 F.2d at 14.

■ 6. Defendants argue that the court's award of $35,000 in attorney's fees to plaintiffs for 350 hours of legal work was excessive. First, they claim that the court erred in valuing the lead attorney's time at $85 per hour for out-of-court work and $125 per hour for in-court work and the assistant attorney's time at between $70 and $90 per hour in light of their limited experience. In fact, the lead counsel has practiced law for ten years and her assistant for four; both have considerable experience in this area; and the skill with which they (indeed, counsel for both sides) presented the case in district court and on appeal renders any claim of inexperience frivolous.

Second, defendants argue that the rates (averaging $100 an hour for the lead attorney, for example) are too high. The rates, however, are within the boundaries of reasonable awards under principles set forth by this court and carefully applied by the district court. *See King v. Greenblatt,* 560 F.2d 1024, 1026–27 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). Other courts have awarded as much. *E.g., Swift v. Blum,* 502 F.Supp. 1140, 1147 (S.D.N.Y.1980) ($100 an hour to lead counsel, $75 an hour to co-counsel); *Allen v. Terminal Transport Co.,* 486 F.Supp. 1195, 1198–99 (N.D.Ga.1980) (grant-

ing "conservative" request of $90 an hour to lead counsel and $75 an hour to co-counsel), *aff'd sub nom. United States v. Terminal Transport Co.,* 653 F.2d 1016 (5th Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1613, 71 L.Ed.2d 849 (1982); *NAACP v. Bell,* 448 F.Supp. 1164, 1168 (D.D.C.1978) ($100 an hour), *rev'd on other grounds sub nom. NAACP v. Civiletti,* 609 F.2d 514 (D.C. Cir.1979), *cert. denied,* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980); *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1056–57 (S.D.N.Y.1977) ($100 an hour to lead counsel), *aff'd mem.,* 578 F.2d 1368 (2d Cir.1978). We cannot say the district court exceeded its powers in awarding the fees.

■ Third, defendants argue that the court should not have included 38.5 hours that plaintiffs' attorneys needed to defend a state declaratory judgment action that PMLP brought against them once it learned that they intended to sue PMLP in federal court. The issues in the state suit were virtually the same as in the federal case. Defendants appeared to have filed it in order to preempt the federal action. And plaintiffs were forced to defend it lest they lose their § 1983 claim in the federal courts through collateral estoppel. *See Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Defense of the state court action was a necessary part of plaintiffs' efforts to achieve their § 1983 goal. It formed part of an "action . . . to enforce a provision of sections . . . 1983 [and] 1985 . . . ," 42 U.S.C. § 1988, and plaintiffs thus can recover attorney's fees. *Cf. Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760 (7th Cir.1982) (granting attorney's fees under related provision for contract debarment proceedings which led to settlement of Title VII suit), *cert. denied,* —— U.S. ——, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Bartholomew v. Watson,* 665 F.2d 910 (9th Cir.1982) (granting attorney's fees for state proceedings initiated in furtherance of § 1983 suit).

7. Defendants argue that the district court should have clarified its judgment. The judgment states "judgment shall enter for [each] plaintiff . . . against each of the individually-named defendants in the fol-lowing amounts . . . ." The parties agreed at oral argument, as the district court's instructions make clear, that the judgment was intended to hold the defendants "jointly and severally," not individually, liable. Although we doubt that the judgment could be read in any other way, because its language has possibly led to some difficulty with a bonding company, we shall amend it. *Byrd v. Hunt Tool Shipyards, Inc.,* 650 F.2d 44, 49 (5th Cir.1981); *cf. Huey v. Teledyne, Inc.,* 608 F.2d 1234, 1236–37 (9th Cir.1979), *cert. denied,* 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982).

The judgment of the district court is amended to read in relevant part:

Amended judgment shall enter for the plaintiff Stella Stathos, jointly and severally, against each of the individually-named defendants in the following amounts:

Count 1 $60,000 Compensatory Damages

Count 2 $15,000 Compensatory Damages

and jointly and severally against the Peabody Municipal Light Commission in the following amount:

Count 1 $60,000 Compensatory Damages

and against each of the individually-named defendants in the following amount:

Count 1 $1,000 Punitive Damages

Amended judgment shall enter for the plaintiff Gloria Bailey, jointly and severally, against each of the individually-named defendants in the following amounts:

Count 1 $60,000 Compensatory Damages

Count 2 $15,000 Compensatory Damages

and jointly and severally against the Peabody Municipal Light Commission in the following amount:

Count 1 $60,000 Compensatory Damages

and against each of the individually-named defendants in the following amount:

Count 1 $1,000 Punitive Damages.

And as so amended, it is

*Affirmed.*