George P. RONIGER, Plaintiff,

v.

H. Carl McCALL, individually and as Comptroller of the State of New York, and Rosemary Scanlon, individually and as State Deputy Comptroller for the City of New York, Defendants.

No. 97 Civ. 8009(RWS).

United States District Court, S.D. New York.

Sept. 15, 1998.

158

Law Office of John A. Beranbaum by John A. Beranbaum, Michael Paley, New York City, for Plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison by Maria H. Keane, Robert S. Smith, Debo P. Adegbile, New York City, for Defendants.

*OPINION*

SWEET; District Judge.

Defendants H. Carl McCall ("McCall") and Rosemary Scanlon ("Scanlon") (collectively, the "Defendants"), have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss this action on the grounds that the Eleventh Amendment to the Constitution bars the claims against Defendants in their official capacities, Defendants are immune from suit in their individual capacities on the claims alleged pursuant to 42 U.S.C. § 1983, and the Complaint fails to state a claim under 42 U.S.C. § 1985(2).

For the reasons set forth below, the motion is denied in part and granted in part. Specifically, the claim against McCall in his official capacity and the claim under § 1985(2) will not be dismissed, and the claim against Defendants in their individual capacities under § 1983 will be dismissed.

*Parties*

Plaintiff George P. Roniger ("Roniger") is 60 years of age and received his Ph.D. in economics from Columbia University. In 1993, he was appointed to the position of Assistant Deputy Comptroller for New York City. Roniger remained employed in the New York State Comptroller's Office until his termination in 1994. Prior to his employment there, he worked at Citibank for 23 years, rising to Director of Regional Economics and Director of Corporate Public Issues.

McCall was, at all times relevant to this action, Comptroller of the State of New York.

Scanlon was, at all times relevant to this action, from September 1993 forward, initially the Assistant Deputy Comptroller for New York City and the senior official in the Office of the State Deputy Comptroller, and thereafter the Deputy Comptroller for New York City.

*Prior Proceedings*

Roniger filed his Complaint in this action on October 29, 1997, pursuant to § 1983 and § 1985(2). The First Amended Complaint (the "Complaint") was filed on May 8, 1998. Prior to the filing of that Complaint, Defendants filed a motion to dismiss on April 13, 1998. The parties thereafter entered a stipulation stating that Defendants consented to the filing by Roniger of the Complaint simultaneously with the filing of the stipulation withdrawing the April 13 motion to dismiss, and the instant motion was filed on May 8, 1998, the day on which the Complaint was filed. Oral arguments were heard on June 17, 1998, at which time the motion was deemed fully submitted.

*Facts*

In considering a motion to dismiss, the facts alleged in the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from Roniger's Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion.

In May 1993, McCall, the Comptroller of New York State, appointed Roniger to the position of Assistant Deputy Comptroller for New York City, the second highest ranking position in the Office of the State Deputy Comptroller for the City of New York ("OSDC"), a division of the State Comptroller's Office. At that time, the top position at OSDC, that of Deputy Comptroller for New York City, was vacant. Thus, Roniger, in his capacity as Assistant Deputy, was "initially in charge of the office." (Compl.¶ 30.) In his position, Roniger met regularly with McCall and First Deputy Commissioner Comer S. Coppie. In addition, Roniger accompanied McCall to high level meetings with City officials, and at McCall's direction, met with City officials on his own.

The OSDC was created by the New York State Legislature in 1975 for the purpose of conducting independent and objective professional reviews of the budgets and financial plans of New York City. OSDC's reports were used and relied upon by City officials and counsel to the City, and by underwriters, issuers, brokers, dealers, and bankers in the private sector. Prior to the appointment of McCall as Comptroller, OSDC had the well-deserved reputation for monitoring the City's operating budget and financial plans in a professional and independent manner. After McCall's appointment, however, the office became highly politicized.

On May 3, 1993, New York City Mayor David Dinkins ("Dinkins") released the City's new four-year Financial Plan. Dinkins and McCall were close political allies. McCall had served in the Dinkins' administration, and Dinkins had appointed McCall's wife as a deputy. Nonetheless, McCall initially criticized the plan. After McCall came under fire for his criticism from the Mayor and others, he never again publicly criticized the Mayor or the actions of the Dinkins' administration.

On June 29, 1993, McCall sent a highly unusual letter to Standards & Poors, an agency that, at that time, was known to be reviewing the City's bond rating in an unfavorable light (the "June 1993 Letter"). The letter essentially recanted McCall's earlier criticism of the City's budget.

Prior to sending this letter, McCall had sought Roniger's views. Roniger viewed this letter unfavorably and as potentially disastrous to the Comptroller because (1) it had demonstrable factual errors; (2) it was inconsistent with a prior OSDC report, which in keeping with the Comptroller's statutory responsibility, had provided an independent and accurate assessment of the City's finances; (3) it downplayed the City's fiscal difficulties; and (4) it was inappropriate for the Comptroller, who is a public official charged with the responsibility to independently review the City finances, to sign a letter drafted by a high level City official applauding fiscal actions undertaken by the City administration.

In response to the Comptroller's solicitation of Roniger's view, Roniger returned a redrafted letter to him that removed the incorrect information and was consistent with the prior OSDC report. Some time later, Roniger learned that the letter had been sent to Standards & Poors in its original form, signed by McCall.

In August 1993, McCall hired and nominated Scanlon to fill the top position at the OSDC. However, this appointment required confirmation by the New York State Senate, which long delayed consideration of her nomination while they reportedly investigated charges that McCall was politicizing the office. Therefore, in order to install and maintain Scanlon as the senior person at OSDC, McCall gave her Roniger's title of Assistant Deputy, which required that Roniger give up his title and assume a lower one. The Complaint supports that this was not a change of substance and that Roniger continued to be junior only to Scanlon within the OSDC, and to hold a policymaking position.

One month later, four of the six highest ranking people at the OSDC, below Roniger, were fired. All of the fired staff members had worked on a draft report that was highly critical of the city budget. Three of the fired employees filed a lawsuit against McCall in federal court, for wrongful termination and retaliation, *Fry v. McCall* (the "Westmeyer Lawsuit"), 945 F.Supp. 655 (S.D.N.Y.1996). They claimed that they were discharged for

truthfully assessing the fiscal position of New York City at a time that McCall had political reasons to downplay the City's fiscal difficulties. They claimed that McCall sought to influence the reports in order to help Dinkins' reelection chances and terminated their employment when they objected.

In August 1994, approximately three months before McCall faced reelection for Comptroller, the plaintiffs in the Westmeyer Lawsuit deposed Roniger in connection with the suit. Roniger did not volunteer to testify, but was advised by counsel for the Comptroller's Office that the plaintiffs in that case would be taking his deposition on August 12, 1994. Roniger believed that he had no choice but to attend.

In response to questioning at the deposition, Roniger truthfully stated that McCall had never sought to influence the conclusions of reports drafted under Roniger's direction. Roniger was questioned at length about the June 1993 Letter, and it was during this questioning that his only criticism of McCall was voiced. The following question and answer transpired:

Q: Do you know whether the portion of the letter that you saw conformed to the statements contained in the various reports sent out by the Comptroller's office concerning the City Financial Plan?

A: As I recall from a distance, it was my view that the letter took too soft a position vis-a-vis the City.

Shortly thereafter, in September 1994, the *Bond Buyer*, a newspaper serving the New York financial community, published an article headlined, "State Comptroller Downplayed Plight of N.Y.C. Budget Woes, Top Aide Says." The *Bond Buyer* story stated, in relevant part:

... George Roniger ... recently said he had misgivings about the letter's content, and specifically, its description of the city's fiscal situation.... The letter, according to the lawyers representing the former analysts gives credence to their charge that the firings were politically motivated....

... Several fiscal analysts interviewed for this article said the letter is unusual because it soft-pedals many of the city's fiscal woes, and because it was written with the assistance of the city officials. Parts of the letter even run counter to the tone and substance of reports produced by McCall's New York office ... In his testimony, McCall said Roniger was responsible for "validity of any document that we produced that he was involved in."

The *Bond Buyer* story was picked up by other newspapers, and the June 1993 Letter became the source of criticism of McCall in his 1994 campaign for Comptroller.

Immediately following the *Bond Buyer* story, McCall and Scanlon conspired to humiliate Roniger and to remove him from the Comptroller's Office. Finally, on November 29, 1994, Scanlon went to Albany, where she met with senior officials of the Comptroller's Office, and on December 1, 1994, she announced that Roniger's employment was being terminated. According to Roniger, Scanlon and McCall both made the decision to terminate him as a direct consequence of his truthful testimony in the Westmeyer Lawsuit.

McCall told Roniger that he would attempt to place him elsewhere in his office. However, McCall made no such efforts, and Defendants have interfered in Roniger's pursuit of other job opportunities.

*Discussion*

### I. *Rule 12(b)(6)*

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195, (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59, (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80, (1957). "This cautionary standard applies with greater force where the plaintiff alleges civil rights violations." *Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir.1995);

*see Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994); *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

## II. *Roniger Has Stated A Claim Against McCall in His Official Capacity*

 Roniger has sued Defendants both in their personal (or individual) and official capacities. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citations omitted) (quoting *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In all respects other than name, as long as the government entity is notified and has the opportunity to respond, suits against government officials in their official capacity are to be treated as suits against the entity itself, not against the official personally; the real party in interest is the entity. *See id.* 473 U.S. at 166, 105 S.Ct. 3099.

 As an initial matter, it should be noted that because Scanlon ceased to be employed by the Comptroller's Office in 1997 and no longer has any "official capacity," McCall is for all practical purposes the only defendant affected by the "official capacity" claim. Accordingly, the claim against Scanlon in her official capacity cannot lie.

 Roniger has requested monetary damages as part of his prayer for relief. Money damages are available under § 1983 only in suits brought against officials in their personal capacities, since money damages against a state are barred by the Eleventh Amendment. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64 n. 5, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Graham,* 473 U.S. at 169, 105 S.Ct. 3099; *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989); *Young v. Patrice,* 832 F.Supp. 721, 724 (S.D.N.Y.1993). However, a suit against a state official in his official capacity is not barred by the Eleventh Amendment if it seeks prospective injunctive relief, rather than monetary damages. *See Dube v. State Univ. of N.Y.,* 900 F.2d 587, 595 (2d Cir. 1990).

 Defendants contend that the instant action is a suit for money damages and nothing else, and therefore the Complaint, insofar as it purports to sue McCall in his official capacity, should be dismissed. However, Roniger asserts that he does not seek monetary relief from McCall in his official capacity. In the event he does, he is barred. Rather, the Complaint adequately puts Defendants on notice of Roniger's claim for "reinstatement" and the basis for this relief. According to Roniger, when he was terminated, McCall promised to find him a new job but did not keep that promise. As per the Complaint, Roniger seeks a judgment

> [e]njoining and permanently restraining these violations of the law; ... directing defendants to take such affirmative action as is necessary to ensure that the effect of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment; [and] directing defendants to place plaintiff in the position he would have occupied but for defendants' discriminatory conduct.

(Compl. at 17–18.)

Defendants concede that the Eleventh Amendment would not bar a claim against McCall for injunctive relief in his official capacity. *See Russell v. Dunston,* 896 F.2d 664 (2d Cir.1990). Reading the Complaint in a light most favorable to Roniger, such relief appears to be sought. Therefore, the claim against McCall in his official capacity withstands Defendants' motion to dismiss.

## III. *Defendants Are Immune From Suit in Their Personal Capacities on the § 1983 Claims Because Roniger's Asserted First Amendment Right Was Not "Clearly Established" in 1994, Given That He Was a Policymaker*

 Under the doctrine of qualified immunity, public officials are shielded from liabili-

ty for civil damages if they establish that (1) their conduct did not violate clearly established rights of which a reasonable person would have known; or (2) that it was "objectively reasonable" to believe that their acts did not violate clearly established rights. *See Anderson v. Creighton,* 483 U.S. 635, 637–41, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Mozzochi v. Borden,* 959 F.2d 1174, 1177 (2d Cir.1992). This defense protects government officials from "the burdens of defending expensive but ultimately unsubstantial, lawsuits and also guards against the risk that 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *Estate of Rosenbaum v. City of New York,* 975 F.Supp. 206, 215 (E.D.N.Y.1997) (quoting *Anderson,* 483 U.S. at 638, 107 S.Ct. 3034, 97 L.Ed.2d 523); *see Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

■ In determining the availability of a qualified immunity defense, the rights alleged to have been violated must be identified, and a determination as to whether they were "clearly established" must be made. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. A right is clearly established when "[t]he contours of the right[ ][is] sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n light of preexisting law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034, *quoted in McEvoy,* 124 F.3d at 97. For example, the Second Circuit has identified three overlapping factors to be examined in determining whether a right was clearly established at the time the defendant acted:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991); *see McEvoy,* 124 F.3d at 97; *Soares v. Connecticut,* 8 F.3d 917, 922 (2d Cir.1993). Under these factors, if neither the Supreme Court nor the Court of Appeals for this Circuit has ruled on the issue at the time of the challenged action, "*a fortiori* it cannot be said that the right in question was defined with 'reasonable specificity' by either the decisional law of the Supreme Court or of this Circuit." *Richardson v. Selsky,* 5 F.3d 616, 623 (2d Cir.1993); *see Salahuddin v. Dalsheim,* No. 94 Civ. 8730, 1996 WL 384898, at *10 (S.D.N.Y. July 9, 1996). Although "under certain circumstances, the absence of specific authority directly on point will not preclude a finding that the law was clearly established," *Shabazz v. Coughlin,* 852 F.2d 697, 701 (2d Cir.1988), for reasons described below, this is not such a case.

■ In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). This is so because qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *See Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow,* 457 U.S. at 815, 102 S.Ct. 2727). Dismissal for failure to state a claim is thus generally appropriate only where the complaint itself sets up on its face the qualified immunity defense. *See, e.g., Green,* 722 F.2d at 1019. The Supreme Court, has, however, also held that "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see McEvoy,* 124 F.3d at 97 ("A defendant pleading qualified immunity on a motion to dismiss is entitled to prevail if the allegations in the complaint fail to 'state a claim of violation of clearly established law.'" (quoting *Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (internal quotations omitted))).

■ At issue in this case is whether it was "clearly established" in 1994 that Defendants, by terminating Roniger—a policymak-

er—for exercising his First Amendment rights through his truthful testimony at a deposition in the Westmeyer Lawsuit, violated Roniger's constitutional rights. It was not.

There are two lines of decisions by the United States Supreme Court that specify the parameters of a public employer's right to take adverse action against an employee for the exercise of First Amendment rights— the so-call *Pickering* line and the *Elrod* line. The instant case fits neatly into neither. It, rather, requires a mingling of the two lines of cases.

In *Pickering v. Board of Ed. of Township High School,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court recognized that a dismissal of a public employee for speaking out on matters of public concern may violate the First Amendment. The *Pickering* Court also recognized, however, that public employees are not always free to say whatever they like. While an individual does not lose the right to make his or herself heard on matters of public concern by accepting public employment, the Court explained that the state, as employer, has a strong interest "in promoting the efficiency of the public services it performs through its employees." *Id.* 391 U.S. at 568, 88 S.Ct. 1731. Thus, the *Pickering* Court established a balancing test to evaluate these competing concerns. Specifically, a court must weigh the extent of the disruption caused by the public employee's speech on "workplace discipline, harmony among coworkers, working relationships, and the employee's job performance, and determine whether the disruption justifies the employer's attempt to stifle the employee's expressive activity." *McEvoy,* 124 F.3d at 98 (citing *Pickering,* 391 U.S. at 569–73, 88 S.Ct. 1731). In a subsequent decision, the Supreme Court added another factor to the balance: "some attention must be paid to the responsibility of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin v. McPherson,* 483 U.S. 378, 390, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Because of the "infinite variety of factual circumstances in which such conflicts might arise," the Court declined to announce a general standard in this area, but instead has relied upon "an identification and weighing of competing interests on a case-by-case basis." *McEvoy,* 124 F.3d at 98 (citation and internal quotations omitted).

Whether a public employee is or is not a "policymaker" is of special importance in deciding the extent of the employee's First Amendment protections. As the Second Circuit observed in *Kaluczky,* "[a]n administration has an interest in ensuring that high-level, policymaking employees adhere to the party line, and promote and implement the agenda of that administration." 57 F.3d at 208. Thus the First Amendment "does not bar 'adverse employment action' based solely on the content of a policymaker's expressive activities or beliefs." *Id.* Indeed, a public employee in a policymaking position may be dismissed because of his or her political affiliation, although non-policymaking employees are generally protected against such dismissal. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see also Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Kaluczky,* 57 F.3d at 208. This "policymaker" exception to the general prohibition against adverse actions motivated by an individual's affiliation was established originally in *Elrod,* in which the Court recognized that public employers have a legitimate "need for political loyalty of employee." *Elrod,* 427 U.S. at 367, 96 S.Ct. 2673.

As an initial matter, it bears noting that the parties agree—indeed, the Complaint effectively concedes—that Roniger was a policymaker. As such, the factors enunciated in *Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir.1994), to be considered when determining whether or not a public employee is a policymaker need not be consulted. *See Kaluczky,* 57 F.3d at 208. Roniger's allegations confirm that he was a policymaker. *A fortiori,* it was reasonable for Defendants to believe that he was a policymaker.

The *Elrod* line of cases, involving employees' rights of political association, is closely related to, but distinct from, the *Pickering* line, involving employees' rights to express

their opinions on matters of public importance. While it is apparent that policymakers may not assert rights under *Elrod*, it was unclear is this Circuit, until the Second Circuit's 1997 decision in *McEvoy*, whether a policymaker could assert rights under *Pickering*. Therefore, it could be reasonably thought—and indeed the defendant in *McEvoy* contended—that public employers were free, under *Pickering*, to terminate policymaking employees for expressive activity of which their employers disapproved.

The *McEvoy* court faced the novel issue of whether a public employer could take adverse action against an employee when the action is taken solely in response to the employee's exercise of his *"Pickering*-protected" speech rights. The Second Circuit articulated the precise issue as follows:

> whether there is a policymaker exception to *Pickering* balancing that immunizes the employer's adverse action, or whether the employee's policymaking status is merely one factor to be considered in determining whether the employer's right to prevent disruptions in the workplace outweighs the employee's right to speak out on matters of public concern.

*McEvoy*, 124 F.3d at 102.

The court decided that in *Pickering* cases, unlike *Elrod* cases, the plaintiff's status as a policymaker is not an automatic bar to the case, but rather it is a "very significant" factor to be considered in the balancing test. *Id.* 124 F.3d at 103. Yet *McEvoy* also decided that the contrary view—that a policymaker's *Pickering* claims were automatically barred—was a reasonable one, entitling the defendants to immunity from personal liability.

McEvoy, the former Police Commissioner of Yonkers, sued Spencer, the Mayor of Yonkers, and Christopher, McEvoy's successor as Police Commissioner, who had demoted McEvoy first from Commissioner to Deputy Chief ("First Demotion") and then from Deputy Chief to Captain ("Second Demotion"). *Id.* 124 F.3d at 96. McEvoy alleged that the demotions were motivated, in part, by his "vocal criticisms" of his predecessor as Commissioner and because of his decision to file the lawsuit against the defendants. *Id.* 124 F.3d at 97.

The court found that the First Demotion was permissible under *Elrod* because it was based both on political affiliation and speech. *Id.* 124 F.3d at 100–01. Since Roniger does not allege that party affiliation played a part in his dismissal, the First Demotion has little significance to the case at bar. As to the Second Demotion, based solely on McEvoy's speech, the court held that McEvoy's status as policymaker did not automatically nullify his rights under *Pickering*. *Id.* 124 F.3d at 102–03. Rather, the Second Circuit ruled that "in a pure *Pickering* case, an employee's policymaking role does not provide an employer with complete insulation for adverse employment action, but does weigh, normally heavily, on the employer's side of the *Pickering* balance." *Id.* 124 F.3d at 103.

However, the court upheld the defendants' qualified immunity defense, reasoning that

> the law was unsettled regarding whether an employee's policymaking status automatically immunized an employer's adverse action even in a pure *Pickering* case. Although we decide in this opinion that no dispositive policymaker exception exists in the *Pickering* balancing test, [defendants] did not violate a clearly established right of [plaintiff's] when, reasonably believing that he was a policymaker, they demoted him ... because of speech activities.

*Id.* 124 F.3d at 105.

Defendants maintain that *McEvoy* disposes of the instant issue and that, like the defendants in *McEvoy*, they were objectively reasonable in deciding that Roniger was a policymaker and was therefore not protected against dismissal by reason of his speech. According to Roniger, Defendants' reliance on *McEvoy* is misplaced, and Roniger's right to testify truthfully, when called upon to do so, without the risk of retaliation, was "sufficiently clear" in 1994.

Roniger distinguishes *McEvoy* from his case by focusing on the type and nature of the speech in which he engaged, stating that it is well established that a person has an obligation to testify truthfully under oath, *see* 18 U.S.C. § 1621 (proscribing perjury), and

that, therefore, the state cannot condition an employee's continued employment on the employee's refusal to commit perjury. Roniger continues that *McEvoy* merely addressed the rights of policymakers to publicly and voluntarily denounce with impunity their employers' policies, and unlike McEvoy, Roniger did not volunteer his testimony but rather had no choice but to attend the deposition.

In support of his proposition, Roniger invokes the Second Circuit's decision in *Piesco v. City of New York*, 933 F.2d 1149 (2d Cir.1991), in which the court held that the state could not penalize a public official simply because she testified truthfully at a legislative hearing. In *Piesco*, the plaintiff, Dr. Piesco, was Deputy Personnel Director in the New York City Department of Personnel. In that position, she was responsible for the evaluation and administration of civil service tests, including a test for the position of police officer. In July 1985, Dr. Piesco appeared at a public hearing of the New York State Senate Committee on Investigations, Taxation, and Government Operations. When the Chairman of the Committee asked her, "[W]ould a functional illiterate pass the [entrance examination to the police academy]?" She replied, "I would say that it is possible." *Piesco*, 933 at 1152. Several months later Dr. Piesco was fired. She thereafter filed suit against the City for terminating her employment in violation of her First Amendment interest in testifying before the State Senate Committee. The district court granted summary judgment in favor of the defendants on the First Amendment claim, and the Second Circuit reversed.

The Second Circuit found that the *Pickering* balancing test applied to the sworn testimony of Dr. Piesco and concluded that her testimony was "entitled to great weight in the *Pickering* balancing test." *Id.* 933 F.2d at 1159. As a threshold matter, the court noted that her testimony involved a matter of public concern. *See id.* 933 F.2d at 1157. In performing the *Pickering* balancing test, the Second Circuit found that "Dr. Piesco's right to give truthful answers before the Committee takes precedence over the City's interest in efficiently performing government services." *Id.* 933 F.2d at 1158. The *Piesco*

court additionally took note that Dr. Piesco's comments were not entirely voluntary, *id.* and pointed out that "it . . . is apparent that [Dr. Piesco's] case can be readily distinguished from those cases where a disgruntled employee voluntarily comments on an employment-related matter out of personal interest." *Id.* 933 F.2d at 1157.

Thus, explains Roniger, at the time of his dismissal in 1994, his right to testify truthfully at his deposition in the Westmeyer Lawsuit, without retaliation, was clearly established. Roniger's analysis, however, ignores a crucial point: *Piesco* fails to discuss whether Dr. Piesco was a policymaker, and, if so, what the rights and ramifications would be given that status. *McEvoy* and *Piesco* both lack elements present here—*McEvoy* does not involve testimony under oath, and *Piesco* does not contend with the possibility of policymaker status in its analysis. Relying, in part, on *McEvoy*, Defendants are on firmer ground as to whether the rights at issue were "clearly established" at the relevant period of time.

*McEvoy* holds that it was reasonable, before the decision in 1997, to believe that a policymaking employee had no First Amendment rights under the *Pickering* line of cases. Roniger's theory that there existed a well-recognized exception for testimonial speech—in essence, that an employee's policymaking status was irrelevant where testimony was at issue—is contradicted by the Second Circuit's decision in *Kaluczky*, which was decided in 1995.

*Kaluczky*, a policymaking official in the City of White Plains, alleged that the defendant town officials had "conduct[ed] a campaign to force his resignation" in retaliation for, *inter alia*, Kaluczky's voluntary and truthful testimony at a disciplinary hearing. The court held that the defendants were entitled to qualified immunity. It summarized its holding as follows:

> Kaluczky alleges that defendants violated well-established rights of speech and association by conducting a campaign to force his resignation. We review the below cases establishing that a public employee in a confidential policymaking position has no First Amendment protection from being

discharged for his political beliefs, his party affiliation or his political statements. Kaluczky, however, claims that this policymaking exception is inapplicable because he was appointed to a six-year term of office, and because *policymaking has nothing to do with his truthful testimony* at the Roche disciplinary hearing. We address each of these claims below; as that discussion will make clear, *each claim raises a novel issue.* It follows that the "contours" of the right alleged to have been violated were not "sufficiently clear that a reasonable official would understand that what he was doing violates that right." Therefore, we hold that the defendants are entitled to immunity from suit in personal capacity.

*Kaluczky,* 57 F.3d at 207 (emphasis added) (citation omitted).

Therefore, in 1995, a year following the events at issue in this case, the issue of whether retaliation for "truthful testimony" negated the "policymaker exception" was "novel" in this circuit, and an official charged with such an act of retaliation was entitled to qualified immunity. *Piesco* does not alter that conclusion. While *Piesco* did reject a claim of qualified immunity, as already stated, it did so without any discussion of the possibility that the plaintiff was a policymaker whose status automatically conferred such immunity on the defendants. *Kaluczky* demonstrates that *Piesco* did not dispose of that issue, for the *Kaluczky* decision, rendered four years after *Piesco,* specifically discussed that prior case and failed to suggest that *Piesco* answered the question of a policymaker's right to remain free of adverse employment action due to his truthful testimony. *Id.* 57 F.3d at 210. Indeed, the *Kaluczky* court specifically declined to decide the issue that Roniger claims was clearly settled in 1994: "whether a policymaker ... may be fired ... for voluntarily or involuntarily giving truthful testimony under oath." *Id.*

In *McEvoy,* in determining whether the lack of a policymaker exception to *Pickering* was clearly established at the time of McEvoy's Second Demotion in 1996, the Second Circuit discussed the impact of the *Kaluczky* decision. It stated that:

*Kaluczky* provides some indication that it settled the point by stating that "there is no explicit *Elrod–Branti* policymaker exception to the *Pickering* line of cases." But even this sentence left open the possibility of an implicit exception, a view supported by the Court's observation that "the governmental interests recognized in both lines of cases [*Elrod* and *Pickering*] are essentially the same." Moreover, *Kaluczky* did not have to decide the analytical significance of a policymaker role in a case, like ours, where adverse employment action (the second demotion) is taken solely because of speech. In *Kaluczky* the measures allegedly taken to punish the employee for his speech were exactly the same as those allegedly taken against him "as a policymaker in the administration of the rival political party." Indeed, Professor Friedman has read *Kaluczky* as supporting a policymaker exception to *Pickering.* Although we do not think *Kaluczky* went so far, we are persuaded that at the time of the second demotion the issue of a policymaker exception to *Pickering* was not definitively settled against employers.

*McEvoy,* 124 F.3d at 103 (citations omitted).

Given *McEvoy, Kaluczky,* and *Piesco,* the factor of "policymaker" in the mix bears more weight, not necessarily in the balancing under *Pickering* as set out in *McEvoy,* but in the analysis of whether the issue at bar was clearly established in 1994 than does the element of "truthful testimony." Truthful testimony, as Roniger notes, is a matter of public concern, invoking the *Pickering* balancing test. However, relying only upon *Piesco,* as does Roniger, which indeed subsumes truthful testimony into the *Pickering* line, ignores the fact that a "policymaker" summons a different line of cases—the *Elrod* line. As previously stated, the instant case commands the mingling of the two lines. The effect of this mingling was not "sufficiently clear" until the Second Circuit's decision in *McEvoy* in 1997. Therefore, it was not "clearly established" at the time of Roniger's termination that Defendants would be violating Roniger's right under the First Amendment to testify truthfully at a deposition by dismissing him, given his status as

policymaker. Accordingly, McCall and Scanlon are entitled to qualified immunity as to the claims alleged under § 1983.

The result reached at bar is not only unfortunate but also unjust in light of today's jurisprudence. The Comptroller of the State of New York will escape liability for his actions against Roniger only because of the difficulties presented by the qualified immunity defense, since Roniger's right, now clear in the wake of *McEvoy,* most regrettably was not sufficiently established in this Circuit in 1994. Despite considerable effort, no reasoning has been found to alter this paradoxical result.

## IV. *Defendants' Motion To Dismiss Roniger's § 1985 Claim Is Denied*

42 U.S.C. § 1985(2) provides in pertinent part:

if two or more persons in any State or territory conspire to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying in a manner pending therein, freely, fully and truthfully, or to injure such party or witness in his or her property on account of his having attended or so testified ... the party so injured or deprived may have an action for recovery of damages, occasioned by such injury or deprivation against any one ore more of the conspirators.

According to Roniger, Defendants conspired to terminate his employment with the OSDC, thereby derailing his career and future employment prospects, in retaliation for exercising his legal obligation to give truthful testimony at a deposition in the Westmeyer Lawsuit, in violation of § 1985(2). Defendants, however, contend that this claim must be dismissed pursuant to the "intraenterprise conspiracy doctrine" because the conduct complained of was that of the Comptroller and Scanlon, who was then Deputy Comptroller—meaning, that of a single entity, acting exclusively through its agents—and, as such, the "two or more persons" requirement of § 1985(2) has not been established.

As stated by the court in *Johnson v. Nyack Hospital,* 954 F.Supp. 717 (S.D.N.Y. 1997),

[t]he intraenterprise conspiracy doctrine is drawn from Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits contracts, combinations and conspiracies in restraint of trade. The evil to which that statute is directed is concerted decisions of two or more business entities to take action "that, in a competitive world, each would take separately." In consequence, the statutory requirement of a plurality of actors is not satisfied by joint action of wholly owned subsidiaries of a single entity, unincorporated divisions of a company, or employees of a single entity acting within the scope of their employment.

*Id.* 954 F.Supp. at 722 (quoting *Stathos v. Bowden,* 728 F.2d 15, 21 (1st Cir.1984)).

The Second Circuit imported the doctrine into § 1985 jurisprudence in *Herrmann v. Moore,* 576 F.2d 453 (2d Cir.1978), in the context of § 1985(2), and *Girard v. 94th Street and Fifth Avenue Corp.,* 530 F.2d 66 (2d Cir.1976), in the context of § 1985(3). In *Herrmann,* the plaintiff alleged that his employment was terminated by the Brooklyn Law School, acting in conspiracy with its own trustees and faculty. The court upheld the dismissal of the complaint, relying on *Girard* and stating that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employment, each acting within the scope of his employment." 576 F.2d at 459.

The plaintiff in *Girard* alleged that a cooperative apartment corporation and its directors had refused to approve the assignment of a lease to her because of her gender. A divided panel of the Second Circuit affirmed the dismissal of the § 1985(3) claim, essentially on the ground that the corporation and its directors, who it saw as having been sued only for actions taken in their capacities as such, were not capable of forming a conspiracy under § 1985(3) as a matter of law. *See Girard,* 530 F.2d at 71–72. It did note, however, that the action complained of was that of a "single policy making body—

the board of directors—and laid considerable emphasis on the fact that none of the individual defendants was alleged to have been 'motivated by any independent personal stake in achieving the corporation's objective.'" *Johnson,* 954 F.Supp. at 723 (quoting *Girard,* 530 F.2d at 72); *see also Gilliard v. New York Pub. Library,* 597 F.Supp. 1069, 1075 (S.D.N.Y.1984) (noting that the complaint did not allege that the conspirators had "acted other than in the normal course of their duties or were 'motivated by an independent personal stake' in achieving the corporation's objective'" (quoting *Girard,* 530 F.2d at 72)).

Roniger seizes on this "personal interest" exception to the intraenterprise conspiracy doctrine to ward off dismissal. *See Geiger v. E.I. DuPont Nemours & Co.,* No. 96 Civ. 2757(LAP), 1997 WL 83291 (S.D.N.Y. Feb. 14, 1997) (observing that where the defendant possessed independent, personal conspiratorial purposes, a plaintiff may allege that employees within a corporation have conspired among themselves such that the § 1985(3) claim would not be subject to immediate 12(b)(6) dismissal); *Rini v. Zwirn,* 886 F.Supp. 270, 293 (E.D.N.Y.1995) (denying a motion to dismiss a § 1985 claim where a town employee, acting as an individual, conspired with other town employees); *Agugliaro v. Brooks Bros., Inc.,* 802 F.Supp. 956, 963 (S.D.N.Y.1992) (stating that plaintiff may maintain a § 1985 claim against a corporation and its agents where the plaintiff alleges that defendants were acting upon their own motives); *Yeadon v. New York City Transit Auth.,* 719 F.Supp. 204, 212 (S.D.N.Y.1989) (rejecting defense that conspiracy within a corporation cannot exist in the context of a § 1985(3) claim where a plaintiff adequately alleges a series of separate discriminatory acts by the corporate entity and its agents and where a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose); *see also Johnson,* 954 F.Supp. at 723–24 (noting that the Second Circuit had alluded to the personal interest exception in *Girard* and finding that personal racial bias "is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine where, as here, the ac-

tion complained of arguably served a legitimate interest of Nyack Hospital").

Roniger maintains that the Complaint adequately alleges that McCall was motivated by personal reasons, wholly apart from his official position as Comptroller. The Complaint notes that McCall himself had politicized the Comptroller's Office because of his personal political connection with Dinkins. Roniger's criticism of McCall pertained to this conflict of interest. Further, Roniger's remark occurred in the midst of McCall's election campaign and became an issue in that campaign. Accordingly, as per Roniger, McCall's "personal stake" in being reelected Comptroller, and in downplaying his compromised political independence, are personal interests apart from the interest of Scanlon or the corporate objective of the Comptroller's Office.

By contrast, according to Defendants, McCall simply had a personal stake in keeping his job and in appearing in a favorable light, the same "stake" every employee of every entity has. After all, all employees want to make a good impression on the people empowered to hire and fire them— whether it is the voters, as in the case of an elected official, or the board of directors, or supervising employees of a corporation.

Defendants attempt to limit the "personal interest" exception by claiming that it applies only where an independent economic interest pursued by an alleged conspirator brings his acts outside the scope of his duties to the corporate entity. They cite *Girard* and *Johnson* in support of this proposition. However, it is not altogether clear that *Girard* imposed this limitation, as the court simply noted that a plaintiff must allege that the defendants committed an act of a personal nature not in connection with corporate affairs. *See Girard,* 530 F.2d at 72.

Additionally, the *Johnson* court was faced with analyzing the unique relationships between hospitals and various classes of physicians affiliated with the hospital, some of whom had competitive economic interests. *See Johnson,* 954 F.Supp. at 724–25. The *Johnson* court stated that "members of hospital medical staffs are capable of conspiring with one another in view of their separate and possibly competitive private economic in-

terests." *Id.* 954 F.Supp. at 724. An elected official, however, is not analogous to a physician affiliated with a hospital.

In the instant case, it would be premature to find that the intraenterprise conspiracy doctrine precludes Roniger's § 1985 claim. It is not clear that Roniger could prove no set of facts supporting the notion that McCall acted upon some personal motive or in furtherance of a personal—maybe even economic—interest outside of the objectives of the Comptroller's Office in terminating Roniger. Therefore, Defendants' motion for dismissal is denied.

### Conclusion

For the reasons set forth above, Defendants' motion to dismiss is denied in part and granted in part. Specifically, Defendants' motion to dismiss the claim against McCall in his official capacity, as well as the § 1985 claim, is denied, and the motion to dismiss the § 1983 claims against McCall and Scanlon in their individual capacities is granted.

It is so ordered.